**Paul KARRER**

v.

**The UNITED STATES.**

No. 485–52.

United States Court of Claims.

May 8, 1957.

Roswell Magill, New York City, for the plaintiff. Albert Rosenblum, New York City, was on the briefs.

Gerard J. O'Brien, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., for the defendant. Andrew D. Sharpe and Jerome S. Hertz, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This is an action to recover $201,504.-88 in Federal income taxes which plaintiff alleges were erroneously and illegally assessed and collected from him for the years 1941 to 1946, inclusive. The question presented is whether payments made by a domestic corporation to a nonresident alien under a contract between the nonresident alien and a nonresident foreign corporation constitute income to the individual from sources within the United States for the purposes of the income tax imposed by § 211(a) (1) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 211(a) (1) (A).

The plaintiff, Paul Karrer, is, and has been since 1918, a professor of chemistry at the University of Zurich, Zurich, Switzerland, where he is Director of the Chemical Institute. He won the Nobel Prize in 1937 for his work in the field of synthetic vitamin structure. Professor Karrer has not been in the United States since 1933, when he spent several weeks here delivering lectures, and does not maintain an office or carry on any business activities in this country.

Plaintiff's duties at the University of Zurich are to give lectures, direct and manage the Chemical Institute and to do scientific research work. Although the university requires him to devote full time to his work, he is free to do what he wishes in such spare time as he may have.

In the early 1930's, Professor Karrer became interested in the flavins, which are yellow dyestuffs that occur frequently in the plant and animal kingdom. Since some researchers had assumed that vitamin B-2 was identical with certain flavins, plaintiff undertook the investigation of the vitamin B group, especially vitamin B-2. Karrer's researches required the extraction of a flavin which could be most conveniently obtained from sweet whey, a by-product of the manufacture of cheese. This flavin substance extracted from whey was lactoflavin and is present in very small quantities only. It was therefore necessary for Karrer to make arrangements for the processing of large quantities of whey from which might be recovered the required amount of lactoflavin needed for his research in the vitamin B field.

On May 7, 1934, plaintiff approached the F. Hoffmann-LaRoche & Co. Ltd. of Basle, Switzerland, hereinafter referred to simply as Basle, and asked it to support his investigations in the vitamin B-2 field by processing a large quantity of whey in accordance with his instructions. At this time, the chemical structure of vitamin B-2 was not known and consequently no one knew whether a synthesis of vitamin B-2 could be made or if it would have any commercial value. On May 8, 1934, Basle wrote plaintiff that it would be glad to cooperate with him and, in July 1934, began processing whey in accordance with instructions received from the professor. Just before Basle began processing the whey, it wrote plaintiff that it was proceeding with the work on the assumption that he would grant Basle the sole right to exploit the manufacturing processes resulting from his investigations if his research proved to be of commercial value. Basle stated that if any process worked out by plaintiff as a secret process showed considerable improvement over existing knowledge, or if the process led to a patent, Basle would grant plaintiff a participation in the net proceeds of the sales of vitamin B-2 products manufactured and sold by it.

Plaintiff accepted Basle's proposal by letter.

Under Swiss law the exchange of letters between plaintiff and Basle constituted a contract which may be designated as a special employment contract under the terms of which all patents resulting from plaintiff's discoveries belonged to Basle, the employer. Both parties understood that plaintiff would be responsible for the scientific work, that Basle would develop the processes for commercial exploitation, that all commercial rights in secret processes or formulae discovered by plaintiff would belong to Basle, together with the right to patent and market products developed therefrom, and that Basle would pay plaintiff a percentage of the net proceeds of the sale of such products. The contract at that time stated the rights of the parties, including the compensation to be paid to plaintiff, in general terms only, because commercial prospects could not then be evaluated.

From the processed whey produced by Basle in accordance with its special employment contract with Karrer, the professor isolated natural vitamin B-2 and sent the prescription to Basle. In August 1934, plaintiff determined the chemical structure of natural vitamin B-2 and from this he proceeded to discover how vitamin B-2 could be produced synthetically in the laboratory. Plaintiff turned this discovery over to Basle, which proceeded to develop the manufacturing processes for the commercial exploitation of vitamin B-2. Basle did not begin marketing synthetic vitamin B-2 in quantity until 1940, because it was not clear until about that time that the vitamin had an important function in the human body or was of any real commercial value.

During the period in 1934, when the plaintiff was doing research on synthetic vitamin B-2, Basle refused to allow plaintiff to work with others in vitamin B-2 experiments. From time to time plaintiff prepared scientific papers for publication in a Swiss chemical journal, but before he submitted such

papers for publication he would send the paper to Basle for its approval. Basle would either approve the paper without change or suggest that certain statements be added or deleted.

During the period from 1934 to 1939, Basle filed applications in many countries for patenting the discoveries and syntheses of Karrer. The plaintiff actively assisted and materially aided Basle in preparing and filing the patent applications and also aided Basle during subsequent litigation involving the patents.

Early in 1939, plaintiff told Basle that he had heard that lactoflavin ampules were on the market and that he assumed Basle would give him a percentage of the sales. A representative of Basle stated that negotiations as to the extent of plaintiff's participation would be concluded as soon as certain patent questions were settled.

On December 9, 1940, after he heard that the sales of lactoflavin could be increased in the future, plaintiff wrote Basle to remind it of its agreement to grant him a participation in the net proceeds of vitamin B-2 sales. After some bargaining between the parties as to the extent of plaintiff's participation it was agreed that plaintiff was to participate in the sales for a period of twelve years. Basle gave the plaintiff the choice of starting participation either on January 1, 1940, or on January 1, 1941, and he selected the latter date. On January 15, 1941, the parties entered into a formal contract specifying the percentage of net proceeds to be paid by Basle to the plaintiff as 5 percent.

In 1937, plaintiff began the study of vitamin E. He discovered that vitamin E substance occurs in the germ of wheat. Because his laboratory in Zurich did not have the equipment necessary to perform all of the experiments required in his research on vitamin E, the plaintiff asked Basle to perform certain experiments for him on extracts from the wheat germ. After isolating natural vitamin E, plaintiff determined the chemical structure of the vitamin and was there-

after able to establish the synthesis of vitamin E. Dr. Otto Isler, a Basle employee, performed extensive experiments in connection with the synthesis of vitamin E, and Basle kept plaintiff informed of Isler's work in that connection. Basle had the same relationship with plaintiff with respect to vitamin E as it had with respect to vitamin B-2. After Basle received the vitamin E synthesis from plaintiff, Basle proceeded to develop the manufacturing process that made it possible to exploit the synthesis commercially.

On August 11, 1938, plaintiff and Basle entered into a formal contract pertaining to the exploitation of the commercial possibilities of their work on vitamin E and fixing the percentage of the net proceeds of the sales which plaintiff was to receive. The contract provided that plaintiff and Basle would collaborate in the synthesis of vitamin E and referred to the parties as partners. Basle had the sole right to take out patents resulting from the collaboration either in its own name or that of Karrer. Patents that were taken in Karrer's name had to be transferred to Basle upon its request, irrespective of whether the patents were applied for before or during the collaboration. The collaboration was to extend for a period of three years and thereafter until one party gave six months' notice to end the agreement. Basle had the exclusive right to commercial utilization of the products of the collaboration and Karrer was to receive 3 percent of the net proceeds of synthetic vitamin E for a period of 12 years. In a supplement to the contract, plaintiff agreed to inform Basle before publishing any article was respect to vitamin E. Plaintiff received payments under the vitamin E contract from December 1, 1938 to November 30, 1950.

In all of his collaboration with Basle, plaintiff never was asked by Basle to participate in the manufacture or sale of the vitamins, nor did he direct or exercise any control over the marketing of the vitamin products.

Basle did not, at any time pertinent to this suit, have a place of business or a permanent establishment in the United States, nor did it engage in any trade or business in this country. On January 27, 1941, Basle and Hoffmann-La-Roche, Inc., of Nutley, New Jersey, hereinafter called Nutley, a New Jersey corporation doing business in the United States as a chemical manufacturing firm with emphasis in the fields of pharmaceutical specialties and vitamins, entered into a contract whereby Nutley was granted the exclusive enjoyment and use within the United States of all of Basle's secret processes and scientific developments pertaining to certain products, including the vitamins which had been synthesized by Karrer. In return, Nutley agreed to pay Basle 4 percent of the net proceeds of sales made by Nutley. This contract terminated a previous agreement between Basle and Nutley whereby for a stated consideration to be paid to Basle, Nutley was given the right to receive and commercially exploit in the United States the results of Basle's research activities. Plaintiff, who had no contractual relationship with Nutley, was not a party to the January 27, 1941, contract between Basle and Nutley.

In all countries other than the United States, Basle applied for patents covering plaintiff's discoveries in its corporate name. In the United States a patent application can be filed only by a natural person, the inventor, and Basle therefore required the plaintiff to file the applications on his vitamin B–2 and vitamin E discoveries. Plaintiff was reimbursed by Basle for all expenses that he incurred with respect to filing the patent applications. Also at Basle's request, plaintiff assigned the vitamin B–2 and vitamin E United States patent applications to Nutley before the patents were granted. The patent assignments to Nutley were thereupon recorded in the United States Patent Office, and the patents themselves were issued to Nutley as owner and assignee of plaintiff, and, in a few instances in the case of vitamin E, as assignee of Dr. Isler, who

had worked with plaintiff in vitamin E research. The procurement of the United States patents was paid for by Nutley or Basle.

The termination dates of the participation contracts entered into between plaintiff and Basle with respect to vitamin B–2 and vitamin E precede the expiration dates of all the United States patents on the two vitamins.

Nutley, the American corporation, produced and marketed vitamin B–2 and vitamin E products and, although Nutley had no contract of any kind with plaintiff, it paid to plaintiff a percentage of all its sales of products containing vitamin B–2 and vitamin E. The percentage paid depended upon the type of preparation involved and was in the amounts specified in the contracts entered into between plaintiff and Basle. Nutley was aware at the time it entered into its contract with Basle that plaintiff was entitled to a percentage of the net proceeds of vitamin B–2 and vitamin E sales made by Basle. In fact Nutley had copies of the contracts entered into between Basle and Karrer, but no mention was made anywhere or at any time in writing of a liability on the part of Nutley to make payments to Karrer. These payments to plaintiff were made by Nutley pursuant to instructions by the president of Nutley. He thought that, although Nutley had no contract with Karrer, since it manufactured synthetic vitamin B–2 and vitamin E products under the Karrer inventions, Nutley should make the payments to Karrer called for by the inventor's contracts with Basle. These payments made to plaintiff by Nutley were characterized on the books of Nutley as royalties.

Nutley withheld and paid United States income taxes on behalf of plaintiff in the sum of $92,978.22 for the years 1941 through 1945. Plaintiff timely filed United States income tax returns for the years 1941 through 1946 and paid a balance shown to be due thereon of $108,526.66. Plaintiff has timely filed claims for refund amounting to $201,-504.88, representing the total amount of

United States taxes paid and withheld from plaintiff on account of the payments made by Nutley to plaintiff with respect to the sale in the United States of vitamin B–2 and vitamin E products. It is with respect to the payment of these taxes that plaintiff filed its claims for refund and now brings suit before this court. Switzerland accords to citizens of the United States the right to prosecute claims against the Government of Switzerland in its courts and therefore plaintiff has standing to sue in the United States in this court.

The defendant says that the payments from Nutley to Karrer were subject to Federal income tax because they were fixed, periodical income to plaintiff from sources within the United States falling within the provisions of section 211(a) (1) (A) of the Internal Revenue Code of 1939. This section provides in part as follows:

> "*Tax on nonresident alien individuals*
>
> "(a) *No United States business or office*
>
> "(1) *General rule*
>
> "(A) *Imposition of tax.* There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 11 and 12 upon the amount received, by every nonresident alien individual not engaged in trade or business within the United States, and not having an office or place of business therein,[1] from sources within the United States as interest (except interest on deposits with persons carrying on the banking business), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, a tax of * * * per centum of such amount,

except that such rate shall be reduced, in the case of a resident of any country in North, Central, or South America, or in the West Indies, or of Newfoundland, to such rate (not less than 5 per centum) as may be provided by treaty with such country."

It is plaintiff's position that the payments made to him by Nutley were for services performed outside of the United States and are therefore not from sources within the United States so as to provide a basis for the imposition of a United States income tax.

In order to determine this question we must define "gross income from sources within the United States" as that term is used in the context of the statutes imposing, limiting and defining the taxes on nonresident aliens.

Section 211(a) (1) (A), above quoted, prescribes a tax upon income from sources within the United States which consists of fixed or determinable, annual or periodical, income. There seems little question from the facts in this case that Karrer received fixed, periodical income as those terms are used in the Code. We must determine, therefore, whether or not as a matter of contract or law the income was from sources within the United States, since section 212 (a)[2] of the Code specifically includes gross income of a nonresident alien *only* income which is derived from sources within the United States. A definition of what is "gross income from sources within the United States" is contained in section 119 of the Code, which provides in pertinent part, as follows:

> "*Income from sources within the United States*—(a) *Gross income from sources in the United States.* The following items of gross income shall be treated as income from sources within the United States:

---

1. 1942 amendment, Act Oct. 21, 1942, 56 Stat. 861, struck out the words "and not having an office or place of business therein".

2. "§ 212. *Gross income—(a) General Rule.* In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States." 26 U.S.C.A. § 212.

\* \* \* \* \* \*

"(4) *Rentals and royalties.* Rentals or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like property; and

\* \* \* \* \* \*

(c) *Gross income from sources without the United States.* The following items of gross income shall be treated as income from sources without the United States:

\* \* \* \* \* \*

"(3) Compensation for labor or personal services performed without the United States." 26 U.S.C.A. § 119.

It is clear from the foregoing excerpt that if the payments to plaintiff by Nutley were for the use of plaintiff's property located in the United States, then those payments are properly characterized as income from sources within the United States and subject to the tax imposed by section 211. On the other hand, should we determine, as plaintiff would have us do, that the payments were compensation for labor or services performed by plaintiff without the United States, we must necessarily hold that the income tax thereon was illegally assessed and collected on income exempted from taxation by section 212(a), *supra.* The issue is, therefore, directed to the precise nature of these payments.

The fact that the payments here in question were made by a United States corporation is not determinative of the right to tax the nonresident alien who is the recipient of such payments. The only criterion for imposing the tax is that the "source" of the income to be taxed must be within the United States. The "source" of income in this connection is not necessarily the payor, but may be the property or the services from

which the particular income is derived as indicated in section 119 of the Internal Revenue Code. In the instant case the vitamin B–2 and vitamin E patents, together with the right to use and sell their commercial values were income producing property and thus a "source" of income. Furthermore, the United States patents and Nutley's right to use and exploit their commercial value were property located within the United States so that payments made by Nutley for such use or for the privilege of such use, would be clearly taxable to the recipient of such payments under section 211. However, we are of the opinion that the payment made by Nutley to Karrer were not payments for the right of Nutley to use any income producing property or interest therein belonging to Karrer.

The right to use and exploit in the United States the patents granted on the discoveries of Karrer was granted to Nutley by Basle pursuant to the terms of the contract of January 27, 1941, and not by Karrer. Basle was the owner of the commercial rights in Karrer's discoveries and it alone could convey this right to another. Plaintiff's only interest in the sales of the vitamins produced and sold arose out of his contractual relationship with Basle. Defendant urges that the payments made to Karrer were in the nature of royalty payments, but that argument is premised upon the assumption that Karrer's contracts with Basle were royalty contracts. The contracts between Karrer and Basle under which the payments in question were made were entered into in Switzerland between Swiss nationals, and their character and interpretation must be governed by Swiss law. The only evidence as to the nature of the contractual relationship between plaintiff and Basle under Swiss law was offered by plaintiff and was to the effect that the relationship was one of special employment. As such, all payments under the Swiss participation contracts to Karrer were payments of compensation for services rendered in Switzerland. Inasmuch as defendant has not refuted this testi-

mony, we must accept it as a correct statement of Swiss law.

Under all the facts and circumstances, and regardless of the particular manner in which the parties to the two Swiss contracts may have referred to each other, it does not appear that there ever existed between Basle and Karrer any relationship other than that of special employment. The arrangement was analogous to the usual one of a person employed to make inventions for his employer, the employer thereby acquiring title to such inventions and to any patents secured thereon. Payments made to such an employee, even though based on a percentage of the proceeds of the sales of the invented process or object, would be compensation for the employee's services rather than royalties, because the employee's right to such payments derives from his services to his employer and not from any rights in inventions owned by the employee. If the services just described were rendered in a foreign country by a nonresident alien they would not be taxable under the clear wording of section 119(c) (3) and section 212(a) of the Internal Revenue Code.

It is true that Karrer received the payments in suit from Nutley, an American corporation, rather than from the Swiss corporation for which he had performed the services and which Swiss corporation was under contractual obligation to compensate him therefor. This circumstance, however, in no way alters the character of the obligation or of the payments made pursuant thereto. Since Nutley paid the plaintiff amounts due on an obligation owing to plaintiff by Basle for services performed for Basle by plaintiff in Switzerland, they do not represent payments for plaintiff's rights or interest in property located in the United States, but rather payments for services performed outside the United States, and are therefore exempt from taxation. Nutley's denomination of the payments as royalties on its books cannot change the true character of these payments.

Defendant cites several cases and urges that Commissioner v. Wodehouse, 337 U.S. 369, 69 S.Ct. 1120, 93 L.Ed. 1419, and Bloch v. United States, 2 Cir., 200 F.2d 63, are applicable to this case. In the Wodehouse case, P. G. Wodehouse, a nonresident alien, sold to a United States publishing house the rights to publish and sell certain stories written by him. The consideration paid for such rights were lump sum payments which the taxpayer contended were the proceeds of the sale of personal property not taxable to a nonresident alien under section 211 of the Code, and, in the alternative, that if the court should find that these payments were in fact royalties, they were not "annual" or "periodical" payments and should therefore be excluded from taxation. The Supreme Court reversed the lower court decision favorable to the plaintiff and held that the lump sum payments were in the nature of advances of royalty payments which were intended to be taxed under section 211. The Court in the Wodehouse case necessarily found that the payments were from sources within the United States, and this finding would seem to follow readily from the fact that Wodehouse himself or his agent had sold the rights directly to a United States publishing house.

The situation presented in the case now before the court is clearly distinguishable on its facts since Karrer sold nothing to Nutley, the American corporation, nor did Basle sell anything to Nutley as the agent for Karrer. As we pointed out earlier herein, Karrer had nothing to sell to Nutley since all rights in his inventions and any patents thereon had vested in Basle.

In the Bloch case, supra, the taxpayer had retained rights in the patents and had in fact granted licenses. Karrer herein never granted to anyone a license to use or exploit his inventions or the patents thereon because he never had such rights under his contract with Basle.

It is the opinion of the court that the payments received by Karrer from Nut-

ley were income from sources without the United States and were not taxable under the internal revenue laws in effect during the period in suit.

Plaintiff is entitled to judgment in the amount of $201,504.88, together with interest provided by law. Judgment will be entered to that effect.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.