PIERRE BOULEZ, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12705–79.     Filed October 16, 1984.

*Allen Greenberg*, for the petitioner.
*Barry Guberman*, for the respondent.

KÖRNER, *Judge*: Respondent determined a deficiency in petitioner's individual income tax for the calendar year 1975 in the amount of $20,685.61. After concessions, the sole issue which we are called upon to decide is whether certain payments received by petitioner in the year 1975 constitute "royalties," within the meaning of the applicable income tax treaty between the Federal Republic of Germany and the United States, and are therefore exempt from tax by the United States, or whether said payments constitute compensation for personal services within the meaning of that treaty, and are therefore taxable by the United States.

The case was submitted to the Court under the provisions of Rule 122,[1] on the basis of a fully stipulated set of facts and exhibits, and our findings of fact herein are based upon said stipulation, the accompanying exhibits, and the facts established by the pleadings.

### FINDINGS OF FACT

The petitioner, Pierre Boulez, resided in Paris, France, at the time the petition was filed in this case. Petitioner is a citizen of France, and during the calendar year 1975 was a

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect in the year in issue, and all Rule references are to the Rules of Practice and Procedure of the Tax Court, unless otherwise noted.

resident of the Federal Republic of Germany (hereinafter FRG). For the taxable year 1975, petitioner was a nonresident alien of the United States for Federal income tax purposes, and he timely filed a Federal nonresident alien income tax return for that year with the Office of International Operations of respondent.

At all times relevant to this case, petitioner was a world-renowned music director and orchestra conductor. On February 19, 1969, petitioner entered into a contract with CBS Records, a division of CBS United Kingdom, Ltd., which is a subsidiary of CBS, Inc., a U.S. corporation. Said contract was modified as of September 13, 1971, and March 14, 1974, and, as so modified, was in effect during the year 1975. Under date of May 1, 1972, with the consent of CBS Records, the contract was assigned by petitioner to Beacon Concerts, Ltd., of London England, which acted as petitioner's agent and undertook to provide his services to CBS Records under the terms of the basic contract, as amended.

As relevant and material herein, the contract between petitioner and CBS Records, as in effect in the year 1975, provided in part as follows:

1. We [CBS Records] hereby agree to engage and you [the petitioner] agree to render your services exclusively for us as a producer and/or performer for the recording of musical and/or literary compositions for the purpose of making phonograph records. It is understood and agreed that such engagement by us shall include your services as a producer and/or performer with the New York Philharmonic for the recording of musical and/or literary compositions for the purposes of making phonograph records.

\*     \*     \*     \*     \*     \*     \*

3. (a) During the first two contract years of this agreement you will perform for the recording of satisfactory master recording [sic] sufficient in number to constitute two (2) 12 inch long playing 33⅓ rpm recordings, or their equivalent, and we will record your performances; and during each contract year commencing September 13, 1971, you will perform for the recording of satisfactory master recordings sufficient in number to constitute three (3) twelve inch long-playing 33⅓ rpm recordings, or their equivalent, and we will record your performances. Additional master recordings will be performed by you and recorded by us at our election.

\*     \*     \*     \*     \*     \*     \*

4. During the period of this Agreement you will not for any reason whatsoever give or sell your services under your own or any assumed name

or anonymously to any other person firm or corporation but nothing herein contained shall preclude you for [sic] giving or selling your services for films personal appearances and broadcasting· (whether or not accompanied by television) provided such services are not reproduced as records for sale to the public and you undertake to have this proviso included in any contract for such services. You will not during the period of five years after the expiration of the term of this Agreement give or sell your services for the purpose of making or assisting in the making of records of any of the compositions or works which you shall have performed under this Agreement. You acknowledge that your services are unique and extraordinary and that we shall be entitled to equitable relief to enforce the provision of this paragraph 4.

5. All master recordings recorded hereunder and all matrices and phonograph records manufactured therefrom, together with the performances embodied thereon, shall be entirely our [CBS Records] property, free from any claims whatsoever by you [petitioner] or any person deriving any rights or interests from you. Without limiting the generality of the foregoing, we (including other divisions of our company) and/or our subsidiaries, affiliates and licensees shall have the unlimited right, from time to time, to manufacture, by any method now or hereafter known, phonograph records and other reproductions, on any mediums or devices now or hereafter known, of the master recordings made hereunder, and to sell transfer or otherwise deal in the same throughout the world under any trademark, trade names and labels or to refrain from such manufacture, sale and dealing;

\* \* \* \* \* \* \*

6. We hereby agree to pay the accompaniment costs and studio charges in connection with the master recordings made hereunder.

\* \* \* \* \* \* \*

13. If, by reason of illness, injury, accident or refusal to work, you fail to perform for us in accordance with the provisions of this agreement, \* \* \* we shall have the option without liability to suspend the application of paragraph 2 and/or paragraph 7 (including the payment of any royalties) of this agreement for the duration of any such contingency by giving you written notice thereof.

Under paragraph 7a of the contract, it was provided "For your services rendered hereunder and for the rights granted to us herein we will pay you the following royalties." There then followed an elaborate formula by which the petitioner was to be paid, based upon a percentage of the retail price derived by CBS Records from the sale of its phonograph records produced under the contract, with said percentage varying depending upon various factors, including, inter alia, whether the musi-

cal composition involved was in the public domain, whether the performance conducted by petitioner was made with the New York Philharmonic Orchestra, whether sales were made by direct sales or mail order through what was termed a "Club Operation," whether the record involved was a "re-issue," etc. In all cases, however, the payments or "royalties" which petitioner was to be entitled to receive were dependent upon future sales of recordings by CBS Records.

Pursuant to the February 19, 1969, contract with CBS Records, as amended, petitioner conducted various performances with the Cleveland Orchestra, the New York Philharmonic, and others in the recording of musical compositions for CBS Records. None of these recordings were from "live" performances (i.e., performances before an audience). They were all private performances arranged solely for purposes of recording. CBS, Inc., was responsible for and exercised control over the setting up of the recording session, employing and paying the members of the orchestra, providing and arranging the equipment and engineers and technicians needed to capture and electronically process the sounds rendered by the orchestra, and for compiling and editing the sounds to make master recordings, matrices, and phonograph records.

Petitioner exercised control over the manner in which the orchestra transposed into aural form the underlying musical composition which was the subject of each recording. He determined the placement of the musicians and the volume of aural sound to be rendered by the various musical instruments making up the orchestra. In conducting the orchestra, petitioner exercised his individual artistic talents of interpreting the musical work. Such interpretation, which is the function of the conductor, differs from conductor to conductor and is unique to each conductor's recording of a particular work.

Applications for the copyrights of all the master recordings, matrices, and phonograph records embodying the sound recordings of the musical compositions conducted by petitioner pursuant to the contract were filed by CBS, Inc., and all registrations thereof were issued by the U.S. Copyright Office registered in the name of CBS, Inc.

As the result of performances conducted by petitioner under the terms of the contract, CBS, Inc., paid to Beacon Concerts, Ltd., as petitioner's agent, the sum of $39,461.47 in the year

1975. Beacon Concerts, Ltd., in turn, paid such sum to petitioner in 1976. In his 1975 U.S. nonresident alien income tax return, petitioner disclosed the receipt of such amount, but excluded it as not being subject to U.S. income taxation. Petitioner reported the identical amount in his 1976 income tax return filed with the FRG as includable income subject to the German income tax, and petitioner paid German income tax thereon.

Upon audit of petitioner's 1975 U.S. income tax return, respondent determined, inter alia, that the entire amount of $39,461 was taxable to petitioner by the United States. Because of an apparent conflict between respondent and the FRG concerning the proper taxation of this income under the existing income tax treaty between the United States and the FRG, competent authority proceedings, pursuant to the provisions of the treaty, were instituted at the request of petitioner and were conducted by the FRG Ministry of Finance and respondent's Office of International Operations in an effort to resolve the issues arising under said income tax treaty.

The competent authorities of the two nations were unable to reach agreement on the correct treatment for income tax purposes of the income here involved. The position of the FRG was that these payments constituted "royalties," within the meaning of article VIII of the treaty, and therefore were taxable exclusively by the FRG. Respondent, on the other hand, took the position that said income was income from performance of personal services in the United States by petitioner, and therefore was taxable by the United States under the provisions of article X of said treaty, except that respondent here concedes that, of the total amount of $39,461.47, the amount of $9,000 was income from sources without the United States and was not subject to taxation by respondent, thus leaving the net amount of $30,461 in issue.[2]

---

[2]Petitioner concedes that, for U.S. income tax purposes, the payment of "royalties" by CBS, Inc., to Beacon Concerts, Ltd., in 1975 is to be treated as being paid directly to petitioner. Respondent's statutory notice determined the additional income in even dollars, thus accounting for the difference of $0.47.

## ULTIMATE FINDING OF FACT

The payments of CBS, Inc., to petitioner in 1975 were payments as compensation for personal services rendered by petitioner.

## OPINION

Petitioner contends that the payments to him in 1975 by CBS, Inc., were not taxable by the United States, because they were "royalties" within the meaning of the applicable treaty between the United States and the FRG. Respondent, as noted above, contends that the payments in question were taxable to petitioner by the United States because they represented compensation for personal services performed in the United States by petitioner. The parties are in agreement that the outcome of this dispute is governed by the effective income tax treaty between the United States and the FRG.

Under date of July 22, 1954, there was executed a "Convention Between the United States of America and the Federal Republic of Germany for the Avoidance of Double Taxation with Respect to Taxes on Income," 5 U.S.T. (part 3) 2768, T.I.A.S. No. 3133. As amended by a Protocol, dated September 17, 1965, 16 U.S.T. (part 2) 1875, T.I.A.S. No. 5920, this convention (hereinafter the treaty) was in effect during the year 1975, and undertook to govern, in stated respects, the income taxation of natural and juridical persons resident in either of the two nations, whose affairs might bring into play the taxing laws of both nations. Petitioner, a resident of the FRG, was a person within the coverage of the treaty. The relevant portions of the treaty provide, in part:

### Article II

(2) In the application of the provisions of this Convention by one of the contracting States any term not otherwise defined shall, unless the context otherwise requires, have the meaning which the term has under its own applicable laws * * *

\* \* \* \* \* \* \*

## Article VIII

(1) Royalties derived by a natural person resident in the Federal Republic or by a German company shall be exempt from tax by the United States.

\*    \*    \*    \*    \*    \*    \*

(3) The term "royalties", as used in this Article,

(a) means any royalties, rentals or other amounts paid as consideration for the use of, or the right to use, copyrights, artistic or scientific works (including motion picture films, or films or tapes for radio or television broadcasting), patents, designs, plans, secret processes or formulae, trade-marks, or other like property or rights, or for industrial, commercial or scientific equipment, or for knowledge, experience or skill (know-how) and

(b) shall include gains derived from the alienation of any right or property giving rise to such royalties.

\*    \*    \*    \*    \*    \*    \*

## Article X

\*    \*    \*    \*    \*    \*    \*

(2) Compensation for labor or personal services (including compensation derived from the practice of a liberal profession and the rendition of services as a director) performed in the United States by a natural person resident in the Federal Republic shall be exempt from tax by the United States if—[3]

Acknowledging that the provisions of the treaty take precedence over any conflicting provisions of the Internal Revenue Code of 1954 (sec. 7852(d); see also sec. 894), we must decide whether the payments received by petitioner in 1975 from CBS, Inc., constituted royalties or income from personal services within the meaning of that treaty. This issue, in turn, involves two facets:

(1) Did petitioner intend and purport to license or convey to CBS Records, and did the latter agree to pay for, a property interest in the recordings he was engaged to make, which would give rise to royalties?

(2) If so, did petitioner have a property interest in the recordings which he was capable of licensing or selling?

The first of the above questions is purely factual, depends upon the intention of the parties, and is to be determined by an examination of the record as a whole, including the terms

---

[3]The treaty then enumerates several conditions which must be fulfilled before the exemption from tax by the United States is effective. The parties are in agreement that the exceptions do not apply in the present case, so that the payments in question, if held to be income from personal services, are taxable by the United States to petitioner.

of the contract entered into between petitioner and CBS Records, together with any other relevant and material evidence. *Beausoleil v. Commissioner*, 66 T.C. 244, 247 (1976); *Downs v. Commissioner*, 49 T.C. 533, 538 (1968); *McClain v. Commissioner*, 40 T.C. 841, 849 (1963); *Chilton v. Commissioner*, 40 T.C. 552, 562 (1963); *Karl R. Komarek v. Commissioner*, T.C. Memo. 1967–112.

The second question—whether petitioner had a property interest which he could license or sell—is a question of law. The treaty is not explicit, and we have found no cases or other authorities which would give us an interpretation of the treaty on this point. We are therefore remitted to U.S. law for the purpose of determining this question. Treaty, *supra* at art. II (2).

We will examine each of these questions in turn.

### 1. The Factual Question

By the contract entered into between petitioner and CBS Records in 1969, as amended, did the parties agree that petitioner was licensing or conveying to CBS Records a property interest in the recordings which he was retained to make, and in return for which he was to receive "royalties?" Petitioner claims that this is the case, and he bears the burden of proof to establish it. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).

The contract between the parties is by no means clear. On the one hand, the contract consistently refers to the compensation which petitioner is to be entitled to receive as "royalties," and such payments are tied directly to the proceeds which CBS Records was to receive from sales of recordings which petitioner was to make. Both these factors suggest that the parties had a royalty arrangement, rather than a compensation arrangement, in mind in entering into the contract. We bear in mind, however, that the labels which the parties affix to a transaction are not necessarily determinative of their true nature (*Kimble Glass Co. v. Commissioner*, 9 T.C. 183, 189 (1947)), and the fact that a party's remuneration under the contract is based on a percentage of future sales of the product created does not prove that a licensing or sale of property was intended, rather than compensation for services. *Karrer v. United States,* 138 Ct. Cl. 385, 152 F. Supp. 66 (1957).

On the other hand, the contract between petitioner and CBS Records is replete with language indicating that what was intended here was a contract for personal services. Thus, paragraph 1 (quoted in our findings of fact) clearly states that CBS Records was engaging petitioner "to render your services exclusively for us as a producer and/or performer * * * It is understood and agreed that such engagement by us shall include your services as a producer and/or performer." Paragraph 3 of the contract then requires petitioner to "perform" in the making of a certain number of recordings in each year. Most importantly, in the context of the present question, paragraph 4 of the contract (quoted in our findings) makes it clear that CBS considered petitioner's services to be the essence of the contract: petitioner agreed not to perform for others with respect to similar recordings during the term of the contract, and for a period of 5 years thereafter, and he was required to "acknowledge that your services are unique and extraordinary and that we shall be entitled to equitable relief to enforce the provision of this paragraph 4."

Under paragraph 5 of the contract (quoted *supra*), it was agreed that the recordings, once made, should be entirely the property of CBS Records, "free from any claims whatsoever by you or any person deriving any rights or interests from you." Significantly, nowhere in the contract is there any language of conveyance of any alleged property right in the recordings by petitioner to CBS Records, nor any language indicating a licensing of any such purported right, other than the designation of petitioner's remuneration as being "royalties." The word "copyright" itself is never mentioned. Finally, under paragraph 13 of the contract, CBS Records was entitled to suspend or terminate its payments to petitioner "if, by reason of illness, injury, accident or refusal to work, you fail to perform for us in accordance with the provisions of this agreement."

Considered as a whole, therefore, and acknowledging that the contract is not perfectly clear on this point, we conclude that the weight of the evidence is that the parties intended a contract for personal services, rather than one involving the sale or licensing of any property rights which petitioner might have in the recordings which were to be made in the future.

## 2. The Legal Question

Before a person can derive income from royalties, it is fundamental that he must have an ownership interest in the property whose licensing or sale gives rise to the income. Thus, in *Patterson v. Texas Co.*, 131 F.2d 998, 1001 (5th Cir. 1942), the Court of Appeals adopted the definition of a "royalty" as "a share of the product or profit reserved by the owner for permitting another to use the property." Likewise, in *Hopag S.A. Holding De Participation, etc. v. Commissioner*, 14 T.C. 38 (1950), this Court held that in order for a payment to constitute a "royalty," the payee must have an ownership interest in the property whose use generates the payment, citing the definition of royalties in section 119(a)(4) of the Internal Revenue Code of 1939 (section 861(a)(4) in the 1954 Code is the same), which states:

Rentals or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States patents, copyrights, secret processes and formulas, good will, trademarks, trade brands, franchises, and other like property, * * *

See also *Downs v. Commissioner, supra*; *Moore v. Commissioner*, T.C. Memo. 1968–110.

In its definition of royalties, the treaty embodies the same fundamental concept of ownership. Thus, in article VIII(3)(a), "royalties" are defined to mean "amounts paid as consideration for the use of, or *the right to use*, copyrights, artistic or scientific works * * * *or other like property or rights*," and article VIII(3)(b) also states that the term "royalties" "shall include gains derived from the alienation of *any right or property* giving rise to such royalties." (Emphasis supplied.)

It is clear, then, that the existence of a property right in the payee is fundamental for the purpose of determining whether royalty income exists, and this is equally true under our domestic law as well as under the treaty.

Did the petitioner have any property rights in the recordings which he made for CBS Records, which he could either license or sell and which would give rise to royalty income here?[4] We think not.

---

[4] It is to be noted that the treaty classifies as royalty income both the income derived from the

As noted in our findings, the basic contract between petitioner and CBS Records was executed in 1969. At that time, petitioner had no copyrightable property interest in the recordings which he made for CBS Records under the Copyright Act of 1909 as amended, 17 U.S.C. sec. 1 et seq., and petitioner concedes that this was so. *Ingram v. Bowers*, 47 F.2d 925 (S.D. N.Y. 1931), affd. 57 F.2d 65 (2d Cir. 1932); *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955).

Petitioner contends, however, that the Copyright Act of 1909 was amended by the Sound Recording Amendment of 1971, Pub. L. 92-140, 85 Stat. 391 (1971), and by virtue of this amendment, petitioner then acquired copyrightable property interests in the recordings which he thereafter made for CBS Records.

We think that petitioner is correct, in that the Sound Recording Amendment of 1971, *supra,* did amend the Copyright Act of 1909 so as to create, for the first time, copyrightable property interests in a musical director or performer such as petitioner who was making sound recordings of musical works, a property right which had not existed theretofore. 17 U.S.C. secs. 1(f), 5(n), 26.[5] In discussing the changes made by the Second Recording Amendment of 1971, and the new property rights therein created in both record producers such as CBS Records and performers such as petitioner, the legislative history contains the following significant statement: "As in the case of motion pictures, the bill does not fix the authorship, or the resulting ownership, of sound recordings, but leaves these matters to the employment relationship and bargaining among the interests involved." H. Rept. 92-487 (1971), 1971 U.S. Code Cong. & Adm. News 1566, 1570.

In spite of this change in the law in 1971, however, petitioner's contractual relationship with CBS Records went on as before. Neither the amendment to that contract of 1971,

---

licensing of property as well as from the sale thereof. Although this definition is broader than the definition of royalty income for U.S. citizens (cf. secs. 1235, 1253), it corresponds to the treatment given to nonresident aliens by the Internal Revenue Code. Sec. 871(a)(1)(D); sec. 1.871–12(b)(1)(iii), Income Tax Regs. Petitioner herein does not make it clear whether he contends that he licensed a property interest which he had in the records which he made for CBS Records, or whether he sold his entire interest, but in view of the breadth of the treaty definition, it does not matter.

[5] The Copyright Act of 1909, 17 U.S.C. secs. 1 through 32, was completely repealed and replaced by the present Copyright Act, Pub. L. 94–553, 90 Stat. 2541, effective Jan. 1, 1978. As to periods prior to that date, however, the former law remains in effect. Pub. L. 94–553, sec. 112.

nor the further amendment in 1974, made any reference to the change of the copyright laws, nor modified the basic contract in any respect which would be pertinent to the instant question. We conclude, therefore, that the parties saw no need to modify their contract because they understood that even after the Sound Recording Amendment of 1971, petitioner still had no licensable or transferable property rights in the recordings which he made for CBS Records, and we think this was correct.

The Copyright Act of 1909, even after its amendment by the Sound Recording Amendment of 1971, describes the person having a copyrightable interest in property as the "author or proprietor" (17 U.S.C. sec. 9), and further provides that "the word 'author' shall include an employer in the case of works made for hire." 17 U.S.C. sec. 26. The above is a statutory enactment of the long-recognized rule that where a person is employed for the specific purpose of creating a work, including a copyrightable item, the fruits of his labor, carried out in accordance with the employment, are the property of his employer. The rule creates a rebuttable presumption to this effect, which can be overcome by express contractual provisions between the employee and the employer, reserving to the former the copyrightable interest. *Scherr v. Universal Match Corp.*, 417 F.2d 497 (2d Cir. 1969), cert. denied 397 U.S. 936 (1970); *Samet & Wells, Inc. v. Shalom Toy Co.*, 429 F. Supp. 895, 901–902 (E.D. N.Y. 1977), affd. 578 F.2d 1369 (2d Cir. 1978).

Here, the petitioner, a musical conductor of world-wide reputation, was employed to make recordings for CBS Records, and in doing so, was to exercise his peculiar and unique skills in accordance with his experience, talent, and best judgment. In these circumstances, we do not think that petitioner was an "employee" in the common law sense, but rather was an independent contractor, with the same relationship to CBS Records as a lawyer, an engineer, or an architect would have to his client, or a doctor to his patient (see *Eicher v. Commissioner*, T.C. Memo. 1984–468). This, however, provides no grounds for distinction, since the "works for hire" rule applies to independent contractors just as it does to conventional employees. *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2d Cir. 1966); *Samet & Wells, Inc. v. Shalom Toy Co., supra*; cf. *Tobani v. Carl Fischer, Inc.*, 98 F.2d

57 (2d Cir. 1938); *Von Tilzer v. Jerry Vogler Music Co.*, 53 F. Supp. 191 (S.D N.Y. 1943), affd. sub nom. *Gumm v. Jerry Vogler Music Co.*, 158 F.2d 516 (2d Cir. 1946).[6]

In the instant case, the application of the "works for hire" rule means that petitioner had no copyrightable property interest in the recordings which he created for CBS Records, even after 1971. Petitioner was engaged for the specific purpose of making the recordings in question; his contract with CBS Records reserved no property rights in the recordings to him, and indeed made it specific that all such rights, whatever they were, were to reside in CBS Records. Under these circumstances, we do not think that petitioner has overcome the statutory presumption of the "works for hire" rule, nor that he has shown that he had any property interest in the recordings, either before 1971 or thereafter, which he could either license or sell to CBS Records so as to produce royalty income within the meaning of the treaty. This conclusion, in turn, reinforces our belief, which we have found as a fact, that the contract between petitioner and CBS Records was one for the performance of personal services.

It follows that respondent was correct in taxing this income to petitioner under the provisions of article X of the treaty.

*Decision will be entered under Rule 155.*

---

[6]In the case of an inventor who created patentable rights in the course of his employment as an independent contractor, in *Gilson v. Commissioner*, T.C. Memo. 1984–447, we recently stated that the "hired to invent" rule does not apply in the case of independent contractors. That case does not conflict with what we do here. In *Gilson*, the ultimate issue was factual, and we found on the facts that the taxpayer there had entered into a contract to be paid for the transfer of his rights in patentable designs, as opposed to a contract for personal services. We need not explore in the present case whether the "hired to invent" rule in the patent law is the same as the "work for hire" rule under copyright law, with respect to its application to independent contractors. As the above-cited cases make clear, the "works for hire" rule *does* apply to independent contractors in the copyright area, and can be negated only by affirmative evidence of a contrary intent of the contracting parties.