Ernest J. CLAYTON, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–712T.

United States Court of Federal Claims.

June 30, 1995.

William W. Chip, Washington, DC, for plaintiffs. Steuart H. Thomsen, Sutherland, Asbill & Brennan, of counsel.

Jeffrey H. Skatoff and Mildred L. Seidman, Washington, DC, with whom was Asst. Atty. Gen. Loretta C. Argrett, for defendant. Phyllis Marcus and Jeffrey Vinnik, Office of Associate Chief Counsel (Intern.), I.R.S., of counsel.

## *OPINION*

MILLER, Judge.

This case is before the court after argument on cross-motions for summary judgment. Plaintiffs' motion for summary judgment presents four independent legal arguments supporting a tax refund for 1986, the taxable year at issue. The resolution of any one issue in plaintiffs' favor will result in a decision entitling plaintiffs to the requested refund. The first issue is whether the distribution resulting from the termination of the Chrysler Corporation Employee Stock Ownership Plan (the "ESOP") to nonresident alien plan participants constituted a stock or cash distribution, given that the participants directed the trustee of the employee stock ownership trust (the "ESOT") to sell their shares of stock for cash and to remit to them the proceeds thereof. Stock distributions are not taxable under section 402(a)(1) of the Internal Revenue Code of 1954 (the "I.R.C."), 26 U.S.C. § 402(a)(1) (1988). Assuming a cash distribution, the second issue is whether the distribution from the ESOP, to the extent attributable to the appreciation in the value of the stock between the date of contribution by Chrysler Corporation and the date of sale, constitutes United States-sourced income and therefore is taxable pursuant to I.R.C. § 871(a)(1)(A). The third

issue is whether the lump-sum cash distribution falls within the parameters of the exception to gross income set forth in I.R.C. § 871(f) concerning annuities. The final issue is whether the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital, Sept. 26, 1980, U.S.–Can., T.I.A.S. No. 11,087 (the "United States–Canada Income Tax Treaty" or "the Treaty"), exempts the distribution from taxation.

## FACTS

The following undisputed facts are derived from the stipulation of facts submitted jointly by the parties, as required by ¶ 10 of the "Joint Draft of 'Test Case' Protocol for *Clayton, et al. v. United States*, 33 Fed.Cl. 628 (Fed.Cl.1995)." At the court's instruction, the parties developed the Protocol in order to adjudicate "just[ly], speed[ily] and inexpensive[ly]," RCFC 1(a)(2), the claims of some 6,200 plan participants who will be bound by the final judgment in this action.[1]

In the Chrysler Corporation Loan Guarantee Act of 1979, Pub.L. No. 96–185, 93 Stat. 1324 (1980) ("the Act"), Congress guaranteed federal loans to Chrysler Corporation ("Chrysler"), provided that Chrysler satisfy certain enumerated conditions set forth in the Act. Specifically, the Act required that employees of Chrysler and its subsidiaries and affiliates make wage concessions and that Chrysler fund an ESOP, meeting both the requirements for qualification under I.R.C. § 401(a) concerning deferred compensation plans and the requirements under I.R.C. § 4975(e)(7) regarding ESOPs.

The Act further required that Chrysler establish as part of the ESOP an ESOT satisfying the requirements for qualification under section 401(a) and that all contributions to the trust be made in accordance with the provisions of the ESOP. Chrysler was to contribute at least $162,500,000.00 in Chrys-

ler common stock for the benefit of its employees. The principal advantages of a qualified trust are that the employer may deduct its contributions immediately upon contribution, the trust is exempt from taxation on its earnings, and employees pay taxes only upon distribution of trust assets. *See* I.R.C. §§ 401(a), 402(a), 404(a), 501(a); Treas.Reg. § 1.401–1(a) (1994).

On or about March 12, 1980, the Directors of Personnel Planning and Wage & Benefit Administration for Chrysler sent a memorandum to Chrysler Personnel Managers and Salary Administrators explaining the basic provisions of the ESOP, including possible tax ramifications. Later that month, on March 21, Chrysler forwarded to the Internal Revenue Service (the "IRS") an application package, which included its "Application for Determination for Defined Contribution Plan," Form 5301.[2] The cover memorandum introducing the application indicated that the Chrysler Board of Directors adopted the ESOP on February 7, 1980, and that the plan met the requirements of I.R.C. §§ 401(a) and 4975(e)(7). The memorandum further explained that the proposed trust agreement complied with the requirements of the Act.

In a letter dated May 21, 1980, the IRS informed Chrysler that it had "made a favorable determination on ... [its] application." The letter further stated that "[c]ontinued qualification of the plan will depend on its effect in operation under its present form...." The effective date of the plan was July 1, 1980, with a plan year ending on June 30. Although Chrysler amended the ESOP on various occasions, these amendments bear no relevance to the issues posed by this case.

Employees eligible for participation in the ESOP included those individuals who had worked for Chrysler or any of its subsidiaries or affiliates for nine continuous months at the beginning of the plan year and who had been

---

1. The " 'Test Case' Protocol" is described *infra* at p. 633.

2. The submission included a cover memorandum requesting expeditious consideration of the application, Form 5301; an Employee Census, Form 5302; copies of the plan, proposed trust agree-

ment, and Chrysler Corporation Loan Guarantee Act of 1979; and a letter from the law firm of Kelly, Drye & Warren, Chrysler's attorneys, dated March 17, 1980, explaining how and why the draft ESOP and ESOT satisfied the requirements of the Act.

affected by the wage and benefit concessions required by the Act. Although employees of the Chrysler subsidiaries operating in Canada ("Chrysler Canada") initially were not part of the ESOP, they became members in January 1981 after agreeing to the required wage concessions. Employees of Chrysler Canada, including Ernest J. Clayton, Gary C. Farfanick, Richard R. Reaume, Richard C. Thrasher, and George D. Wilson ("plaintiffs"), participated in the plan during different years.[3] For example, Messrs. Clayton, Farfanick, Reaume, and Wilson, union employees, participated during the plan years ending in 1981 and 1982, whereas Mr. Thrasher, a nonunion employee, participated from 1981 through 1984.

Chrysler contributed shares of Chrysler common stock from 1981 through 1984 to the ESOT. Its trustee was Manufacturers National Bank of Detroit ("MNB"), a commercial bank. MNB retained the stock certificates, which were issued in the name of MNB's nominee, Calhoun & Company. Pursuant to section 7(c)(3)(C) of the Act, the trustee allocated stock contributed by Chrysler to the individual accounts of the ESOP participants in equal amounts, provided that the participant had worked 650 hours or more during the plan year. This method of allocation stands in contrast to the usual method of allocating stock contributions in proportion to compensation—a practice that discriminates in favor of highly-compensated employees and that is characteristic of non-qualified plans.

The trustee also invested any dividends received on the stock allocated to a participant's account in additional shares of Chrysler common stock. Although the trustee possessed the power of investment, the Act authorized the participants to vote the shares in their accounts. In the absence of express direction, the trustee was required to vote the stock for which no directions had been

received in the same proportion to the stock as to which directions had been received.

The ESOP authorized distributions to employees only in the event of death, in which case the proceeds were forwarded to the designated beneficiary; termination of employment; and termination of the ESOP. The distributions at issue were made by the trustee due to Chrysler's agreement in 1985 with the autoworkers union to terminate the ESOP.

To initiate plan termination, the Chrysler ESOP Committee circulated a memorandum dated November 1985 to "Canadian Hourly Participants in the Chrysler Employee Stock Ownership Plan," entitled "Termination of Plan and Distribution of Stock" (the "distribution memorandum"). This memorandum advised that "termination ... [was] tentatively scheduled for mid-January, 1986, pending U.S. Internal Revenue Service rulings." Upon plan termination the shares of Chrysler stock held in each participant's account would "be available for distribution" to each participant or to the Chrysler Deferred Pay Plan, "in the form of cash or stock." Included with the distribution memorandum was a "Distribution Preference Card for Canadian Hourly Participants," on which plan participants were asked to select one of four distribution methods and to submit the card to the trustee no later than December 9, 1985.[4]

Approximately 8,000 Canadian participants, including plaintiffs, selected Option 2, which, as explained in the distribution memorandum, provided that the Trustee would sell all of the participant's shares to Chrysler, with no fees or commissions charged, and thereafter distribute the cash proceeds to the participant. On each business day from December 9–20, 1985, the trustee sold to Chrysler 10 percent of the total amount of stock allocable to the ESOP accounts of those participants who had selected Option 2. The

---

3. From July 1, 1980, through the date of ESOP termination, plaintiffs were Canadian citizens and residents, performing services for Chrysler Canada in Canada. The Income Tax Treaty in effect between the United States and Canada throughout this period specifies that plaintiffs were residents of Canada. *See* United States–Canada Income Tax Treaty, art. IV, ¶1, T.I.A.S. No. 11,087, at 6. The parties have stipulated

that none of the plaintiffs was present in the United States for 183 days or more during 1985 or 1986.

4. The court notes that the distribution memorandum outlined five distribution options, whereas the preference card provided only four.

sale price was the closing price on the New York Stock Exchange for each sale date, which consistently exceeded the price of the stock as of the date of Chrysler contribution to the ESOP.

Within seven days of each sale, Chrysler forwarded to the trustee funds representing the purchase price for each day's transaction. The trustee invested these funds in interest-bearing accounts until such time as the trustee remitted the proceeds to the participants. On December 26, 1985, the trustee sent to Chrysler's stock transfer agent, Morgan Guaranty Trust Co. of New York, the stock certificates representing the shares in all participants' accounts. Four days later, on December 30, the trustee "instructed the stock transfer agent to transfer to Chrysler the shares that had been sold to Chrysler, to cancel the certificates representing those shares, and to hold the remaining shares in the name of Calhoun & Company." Stipulation of Facts filed Dec. 12, 1994, ¶ 13.

Sometime between January 2 and 16, 1986, Chrysler directed the stock transfer agent to issue the remaining shares in the names of those participants who had not elected a sale of stock under Option 2, but, instead, had requested a distribution of stock certificates under Option 4 of the distribution preference card. Chrysler further instructed the transfer agent to transmit these individual certificates to the trustee for distribution.[5] On January 17, 1986, the trustee mailed the individual stock certificates to the relevant participants and remitted to plaintiffs and other participants electing Option 2 the cash proceeds resulting from the sale of their stock, plus any interest accruing from the date of sale [6] to the date of remittance.[7] The cash funds represented the value of the stock

contributed by Chrysler, the appreciation of that stock between the date of contribution and date of sale, and an interest component. The trustee, however, did withhold, for income tax purposes, 15 percent of the amount representing the stock's appreciation in value from the date of contribution to the date of sale. The parties' dispute hinges on the taxability of the portion of the distribution attributable to the stock's appreciation. The income tax withheld for plaintiff Thrasher was $917.64 and for each of the other named plaintiffs, $808.23.

In 1985 Chrysler requested rulings from the IRS as to the tax consequences associated with both stock and cash distributions from the ESOP to nonresident aliens. On May 27, 1986, and June 17, 1987, the IRS issued the requested rulings, which, in general, provided that only cash distributions were taxable. Priv.Ltr.Rul. 86–33–081 (May 27, 1986); Priv.Ltr.Rul. 87–38–015 (June 17, 1987). The record indicates that the IRS informed Chrysler as to the probable outcome with respect to these rulings in late 1985.

Each of the plaintiffs filed a timely claim for refund, which the Commissioner of Internal Revenue denied. Thereafter, on October 13, 1992, plaintiffs filed both a complaint in the United States Court of Federal Claims and a motion for class certification pursuant to RCFC 23, seeking to certify as a class all individuals similarly situated to the named plaintiffs, who were employees of Chrysler Canada and who made claims for the refund of taxes withheld by the trustee in 1986. Following argument on plaintiffs' motion, the court entered an order on November 19, 1992, holding the ruling on the motion in

---

**5.** On January 15, 1986, all ESOP participants received a dividend, which had been previously declared by Chrysler on December 5, 1985. *See infra* note 16.

**6.** The record is unclear as to the specific date on which the cash proceeds began accruing interest. Paragraph 13 of the Joint Stipulation of Facts filed December 12, 1994, states that "MNB invested the funds in interest-bearing accounts and obligations *from the date of receipt [of funds from Chrysler]* until the date the proceeds were remitted to the participants...." (Emphasis added.) Paragraph 13, however, also states that on Janu-

ary 17, 1986, the trustee distributed the cash proceeds from the sale, including "interest on the proceeds between *the date of the sale* and the date of remittance." (Emphasis added.)

**7.** As of this date, the records, maintained by Chrysler, of each participant's ESOP account reflected a zero balance. The individual records identified the number of Chrysler-contributed shares and shares purchased with dividend proceeds by the trustee. The records, however, did not identify the cash proceeds associated with the sale of stock to Chrysler in 1985.

abeyance pending development of a protocol for test cases.

The parties developed a "Test Case Protocol" (the "Protocol") and an "Anticipatory Settlement Agreement," draft copies of which were filed with the court on June 30, 1993. The court approved these drafts on July 21, 1993. Paragraph 2 of the Protocol states:

> The purpose ... is to guide the management of the action by Clayton et al. as a 'test case' on the basis of which the United States and members of the proposed class of plaintiffs can settle the factual and legal issues that the members have in common with Clayton et al. or with a limited number of other 'test plaintiffs' who may be added to the action.

The Protocol includes several important agreements between the parties, such as defendant's agreement to extend the statute of limitations for the filing of a tax refund suit for taxes withheld by the trustee. Plaintiffs' counsel has executed this extension on behalf of 6,200 refund claimants. The Protocol further provides that "the United States will enter into an anticipatory settlement agreement with individual parties to the extension agreement...." The Anticipatory Settlement Agreement stipulates that the United States and all parties to that agreement will be bound by the determinations made by the court in its final decision concerning the test case action of *Clayton, et al.* This agreement thereby protects against inconsistent adjudications of similarly situated taxpayers. Plaintiffs' attorney executed the Anticipatory Settlement Agreement on their behalf on June 14, 1995, and filed it the following day.

In addition to memorializing agreements between the parties, the Protocol identifies the activities to be performed by the parties and specifies the dates on which such activities must be completed. The parties construe the Protocol as "operat[ing] as a proposed scheduling order." Joint Status Report filed June 30, 1993, at 1. For example, the Protocol required both parties independently to develop within a specified period a list of conditions that each respective party deemed necessary to establish that the withholding constituted an overpayment, thereby necessitating a refund. The Protocol also called for a joint memorandum describing the undisputed relevant facts, as well as the legal issues underlying plaintiffs' action. Following submission of these documents, the Protocol specified that either party could file a motion for summary judgment.

The court will not rule on plaintiffs' motion for certification under RCFC 23 because the parties successfully developed the Protocol and Anticipatory Settlement Agreement, which, in the court's view, is a preferable and less costly alternative to class action certification. The court commends the parties for their efforts in developing and implementing the Protocol.

## DISCUSSION

In a tax refund case, there is a strong presumption as to the correctness of the Commissioner of Internal Revenue's tax assessment determination. *E.g., Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Young & Rubicam, Inc. v. United States,* 187 Ct.Cl. 635, 644, 410 F.2d 1233, 1238 (1969). The taxpayer bears the burden to both rebut this presumption and to establish entitlement to the exact dollar amount comprising the claimed overpayment. *United States v. Janis,* 428 U.S. 433, 440–41, 96 S.Ct. 3021, 3025–26, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor,* 293 U.S. 507, 514–15, 55 S.Ct. 287, 290–91, 79 L.Ed. 623 (1935); *Eli Lilly & Co. v. United States,* 178 Ct.Cl. 666, 677, 372 F.2d 990, 997 (1967).

To overcome the presumption, the taxpayer must present "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151–52, 510 F.2d 1365, 1369 (1975). However, even after presenting such evidence, and thereby satisfying the burden of going forward, the taxpayer still bears the burden of persuasion. *See Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293, *modified,* 284 U.S. 599, 52 S.Ct. 264, 76 L.Ed. 514 (1932) (holding taxpayer must prove entitlement to withheld monies); *Kraft, Inc. v. United States,* 30 Fed.Cl. 739, 757 (1994) (holding that once presumption disappears, "the court is left to

independently resolve the question of the tax upon the basis of all of the evidence of record before it. . . .") (citations omitted); *Sara Lee Corp. v. United States*, 29 Fed.Cl. 330, 334 (1993) (ruling that in tax refund case taxpayer bears burden of proof, including both burden of going forward and burden of persuasion).

## I. *The form of the distribution: stock or cash*

■ I.R.C. § 402(a)(1) governs the taxability of any distribution made to beneficiaries of an employees' trust designated as qualified under section 401(a). Section 402(a)(1) applies in this case because the IRS determined on May 21, 1980, that the Chrysler ESOP was a stock bonus plan and that the ESOT constituted a qualified trust for purposes of section 401(a).

Section 402(a)(1) provides that *"the amount actually distributed* to any distributee . . . shall be *taxable* to him *in the year in which so distributed*, under section 72 (relating to annuities). . . ."* (Emphasis added.) The provision further specifies that the amount actually distributed does "not include net unrealized appreciation in securities of the employer corporation attributable to the amount contributed by the employee."

Prior to plan termination, Chrysler requested rulings concerning the tax consequences under I.R.C. § 402(a)(1) associated with both a stock and cash distribution from the ESOP to nonresident aliens. In responding to the request concerning the effects of a stock distribution, the IRS characterized Chrysler's contributions to the ESOP as employee contributions for purposes of section 402(a)(1) and on this basis ruled that the net unrealized appreciation was not includible in gross income upon distribution of the stock. Priv.Ltr.Rul. 87–38–015 (June 17, 1987). The net unrealized appreciation represents the difference in stock value between the date of contribution to the ESOP by Chrysler and the date of stock distribution.

In the same letter ruling, the IRS stated that the gain resulting from a later sale of the distributed stock will be taxable if the taxpayer satisfies I.R.C. § 871(a)(2), which provides that gain from the sale of a capital asset held by a nonresident alien is includible in gross income only if the nonresident alien is present in the United States for 183 days or more during the year of sale. The taxable gain from the sale would include only the amount attributable to stock appreciation, as opposed to the basis or value of the stock as of the date of Chrysler contribution. The basis is not includible in gross income, because it represents amounts paid for personal services performed outside the United States. . *See* I.R.C. § 871(a)(1) (stating that only United States-sourced income is includible in gross income of nonresident alien); I.R.C. § 862(a)(3) (indicating that compensation for services performed outside the United States is not United States-sourced income).

With respect to a cash distribution to nonresident aliens, the IRS took the position, in a separate ruling, that the portion of the distribution representing the earnings and accretions of the ESOT was taxable at a rate of 15 percent.[8] Priv.Ltr.Rul. 86–33–081 (May 27, 1986). The IRS also determined that the portion of the distribution representing Chrysler's contribution was not taxable because it represented payment for services performed outside the United States. *See* I.R.C. § 862(a)(3); Rev.Rul. 79–388, 1979–2 C.B. 270.

These rulings demonstrate that the tax consequences associated with a distribution from the Chrysler ESOP to nonresident aliens differ dramatically depending upon the form of the distribution. The threshold issue in this case is whether the distribution to plaintiffs was one of stock, and therefore not taxable,[9] or one of cash, and therefore tax-

---

8. Although I.R.C. § 871(a)(1) imposes a 30–percent tax on certain income received by nonresident aliens, the IRS assessed only a 15–percent taxable rate, because I.R.C. § 894(a) instructs that the Code must be applied in the context of any treaty affecting the taxpayer. In this case the IRS relied on art. XXII, ¶ 2, T.I.A.S. No. 11,087, at 20, of the United States–Canada Income Tax Treaty as the basis for reducing the tax rate.

9. If the court ruled that the distribution was one of stock, the gains resulting from the sale of such stock would not be includible in gross income,

able at a 15–percent rate. Although the IRS addressed the general tax consequences of stock and cash distributions from the ESOP, it never ruled as to the form of the distribution that occurred in this case.

Defendant maintains that the distribution from the ESOP was of cash and that therefore the IRS properly taxed the earnings and accretions at a 15–percent rate. *See* Rev. Rul. 79–388. Plaintiffs disagree, arguing that the distribution was of stock. According to plaintiffs, the ESOP only allowed for a stock distribution, and this is exactly the form and nature of distribution that occurred prior to the sale of the stock to Chrysler in December 1985. Although plaintiffs concede that they never actually received stock certificates, they argue that a distribution of stock occurred for purposes of I.R.C. § 402(a)(1) when the trustee of the ESOT became plaintiffs' agent by accepting plaintiffs' directions to sell the stock for cash. Plaintiffs cite Rev.Rul. 81–158, 1981–1 C.B. 205, to support this proposition.

Alternatively, plaintiffs argue that, even assuming that the ESOP did not contemplate a pre-sale distribution of stock, the distribution occurred as a matter of law according to Rev.Rul. 68–666, 1968–2 C.B. 283, which states that a distribution occurs whenever a fiduciary accepts directions from the beneficiaries to sell stock. Plaintiffs' arguments raise several issues, including whether the ESOP contemplated only a stock distribution and whether plaintiffs' theory of stock distribution is consistent with the actual distribution requirement of I.R.C. § 402(a)(1). *See* I.R.C. § 402(a)(1) (discussing taxability of "amount[s] *actually distributed*") (emphasis added).

1. *Did the ESOP allow only stock distributions?*

Section 6.3(b) of the ESOP addresses the mechanics of plan distributions and provides:

*All distributions shall be in the form of whole shares of Qualified Common Stock having a fair market value at the Valuation Date next preceding the date of distribution as nearly as possible equal to the value of the Participant's Accrued Benefit at that Valuation Date, with cash in lieu of fractional shares; provided, however, that any Participant who is entitled to a distribution from the Trust Fund may direct the Trustee as his agent to sell at the market price the shares otherwise distributable to him, and to remit the net proceeds thereof.*

(Emphasis added.) Plaintiffs contend that "[s]ection 6.3(b) required that the trustee be the 'agent' of the participants when it sold their stock to ensure that the stock would be recognized as having been distributed to the participants. . . ." Plfs' Br. filed Jan. 18, 1995, at 6.

Defendant concedes that both when the drafters created the ESOP and when Chrysler submitted the ESOP to IRS for review, I.R.C. § 409A(h)(2) allowed only stock, not cash, distributions from ESOPs. Following Chrysler's submission of the plan, on April 1, 1980, Congress amended section 409A(h)(2) to allow for both cash and stock distributions from ESOPs. Technical Corrections Act of 1979, § 101(a)(7)(E), Pub.L. No. 96–222, 94 Stat. 194, 198 (1980). In approving Chrysler's plan on May 21, 1980, the IRS did not indicate the version of section 409A(h)(2) upon which its approval rested. Defendant seizes upon this apparent ambiguity in the IRS' approval, arguing that section 6.3(b) reasonably can be interpreted to allow for both stock and cash distributions, given that the law as of the date of distribution and plan termination authorized distributions of both stock and cash.

The court cannot accept defendant's conjecture as to what constitutes a reasonable interpretation of section 6.3(b). Both parties concede that the drafters intended only a stock distribution and that the law in effect at the time of plan submission authorized only stock distributions. The court therefore holds that the IRS approved a plan that provided for only stock distributions. This

because the parties have stipulated that none of the plaintiffs was present in the United States for 183 days or more during the year of sale. *See* I.R.C. § 871(a)(2) (providing that gains from sale of capital asset are taxable to nonresident aliens only where such individuals are present in United States for 183 days or more during year of sale).

ruling, however, does not mean that every conceivable distribution arrangement qualifies as a stock distribution. The IRS' approval of the substance of the distribution was one of stock; it did not approve all of the details and mechanics surrounding the form of the distribution transaction.

2. *Whether plaintiffs' theory of stock distribution comports with the actual distribution requirement of I.R.C. § 402(a)(1)?*

Plaintiffs maintain that the distribution of stock occurred prior to the sale of stock to Chrysler. Specifically, distribution occurred when the trustee accepted plaintiffs' directions to sell the stock, because that was the point at which the trustee's status changed from that of trustee to·participant's agent in accordance with section 6.3(b). Plaintiffs rely primarily on Rev.Rul. 81–158 for the proposition that a distribution occurs for purposes of I.R.C. § 402(a)(1) whenever the individual "who has custody of the stock recognizes that his status has changed from holding the stock on behalf of one person [*i.e.*, Chrysler] to holding the stock on behalf of the other person [*i.e.*, the employee]." Transcript of Proceedings, *Clayton, et al. v. United States*, No. 92–712T, at 23 (Fed.Cl. May 11, 1995) (hereinafter "Tr."). To further bolster their position of a pre-sale distribution, plaintiffs argue that the ESOP prohibited the trustee from taking directions from the participants regarding the sale or alienation of stock, except in those limited circumstances where the trustee was acting *as the participants' agent for purposes of* distribution pursuant to section 6.3(b). *See* ESOP § 9.2.

Defendant distinguishes Rev.Rul. 81–158, arguing that the ruling was issued prior to the amendment of I.R.C. § 402(a)(1), which occurred in 1981. Economic Recovery Tax Act of 1981, § 314(c), Pub.L. No. 97–34, 95 Stat. 172, 286 (1981) (the "ERTA"). Prior to amendment section 402(a)(1) required that amounts held in an employees' trust were taxable "when actually paid, distributed, or

*when made available to the distributee.*" Joint Committee on Taxation, 97th Cong., 1st Sess., General Explanation of the Economic Recovery Tax Act of 1981 214 (Comm.Print 1981) (emphasis added) (hereinafter "Joint Committee–General Explanation"). In 1981 Congress deleted the "made available" language, leaving section 402(a)(1) to read: "[T]he amount *actually distributed* to any distributee by any employees' trust ... shall be taxable to him, in the year in which so distributed...." [10]

Benefits were construed as being "made available" whenever no substantial restrictions affected an employee's right of withdrawal. Thus, prior to the amendment, whenever the employee had an unrestricted right to withdraw his plan benefits, the benefits would be taxable to the employee in that year even though the employee had not actually reduced the benefits to his possession. By deleting the "made available" language, Congress sought to reduce administrative burdens, which had resulted from plan administrators developing a complex array of restrictions to avoid distributions under section 402(a)(1).

The Joint Committee–General Explanation clarifies that, following amendment, the constructive receipt of benefits no longer qualifies as a distribution. *See* 26 C.F.R. § 1.451–2 (1994) (stating that "[i]ncome although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time...."). Defendant argues that an actual distribution of stock out of the trust was necessary for the distribution at issue to qualify as a distribution under I.R.C. § 402(a)(1), because, as of 1985, the statute no longer authorized constructive or deemed distributions. Joint Committee–General Explanation 214. According to defendant, the only distribution out of the trust was of cash and that occurred on January 17, 1986.

Defendant, however, can cite no authority, other than the legislative history, for the

---

**10.** The amended "provision ... [was] effective with respect to taxable years (of distributees) beginning after December 31, 1981," and is therefore relevant to the disposition of this case. Joint Committee–General Explanation 215.

position that the distribution at issue does not qualify as an actual distribution under I.R.C. § 402(a)(1). The dearth of cases addressing section 402(a)(1) generally deals with taxpayers' attempts to take advantage of the constructive receipt doctrine post-amendment and does not specifically define what constitutes an actual distribution. *See Hegarty v. Commissioner*, 63 T.C.M. (CCH) 2,335, 2,337 (1992) (ruling that cash balance in employee stock option plan was not actually distributed to taxpayers under section 402(a)(1) when taxpayers received statement of account reflecting cash balance, but was distributed when taxpayers received distribution check).

Plaintiffs interpret Congress' concern regarding I.R.C. § 402(a)(1) as focused on those situations wherein the beneficiary did not desire a distribution and the trustee did not intend to make a distribution. Plaintiffs therefore maintain that the rationale underlying the amendment does not pertain to the specific situation in issue, since the trustee intended to make a distribution and such a distribution was made in accordance with section 6.3(b) of the plan. Plaintiffs further argue that the distribution in this case occurred, not because the stock was "made available," but because the trustee accepted plaintiffs' directions to sell the stock, causing the trustee's status to change to that of participants' agent under section 6.3(b).

In outlining the reasons underlying the amendment to section 402(a)(1), the Joint Committee on Taxation addressed only the elimination of taxation under the principles of constructive receipt. The Committee, however, did not resolve what constitutes an actual distribution for purposes of I.R.C. § 402(a)(1), as amended, and more specifically, did not discuss the effect of a constructive delivery in circumstances parallel to this case under the amended statute. Because this case does not fall squarely within the parameters of the constructive receipt doctrine, the issue is whether plaintiffs have satisfied their burden of proof in establishing that their theory of stock distribution is consistent with I.R.C. § 402(a)(1), as amended.

Plaintiffs rely heavily on Rev.Rul. 81–158 for the proposition that when the status of an individual holding stock changes, a distribution occurs for purposes of section 402(a)(1). Although the ruling was published prior to the amendment of section 402(a)(1), the court notes that the IRS has cited the ruling with approval following amendment. *See* Rev. Rul. 82–75, 1982–1 C.B. 116.

Rev.Rul. 81–158 discussed two different distribution scenarios and identified the dates on which taxpayers received distributions of stock for purposes of I.R.C. § 402(a)(1). The revenue ruling, which applied the rule of *Byrne v. Commissioner*, 54 T.C. 1632, 1970 WL 2306 (1970), *aff'd*, 449 F.2d 759 (8th Cir.1971), to qualified plans, provided that when a trustee delivers stock certificates to a transfer agent and issues instructions for that agent to reissue the certificates in the name of the distributee, the date on which the transfer agent received the certificates and instructions constitutes the date of distribution to the distributee for purposes of I.R.C. § 402(a)(1). The ruling further stated that, when a custodian delivers to the transfer agent an order to cancel a confirmation and to reissue it in the name of the distributee, the date of delivery of the order to the transfer agent marks the date of distribution to the distributee under section 402(a)(1).

Plaintiffs oversimplify the ruling of Rev. Rul. 81–158 by arguing that a distribution occurs under section 402(a)(1) whenever the person who has custody of the stock changes roles, which in this case occurred when the trustee became the participants' agent under section 6.3(b) of the ESOP by following plaintiffs' directions to sell the stock. The revenue ruling is distinguishable from the instant case. Under the first scenario, which, like this case, concerned a distribution from a qualified trust, the trustee transferred certificates out of the trust to a transfer agent.[11]

---

11. Although *Byrne*, which is cited with approval in Rev.Rul. 81–158, did not involve a distribution from a qualified plan, it did involve the transfer- or's delivering stock certificates to a transfer agent with instructions to reissue the certificates in the name of the distributee. The court ruled that the date of delivery to the transfer agent qualified as the date of distribution to the distributee.

Thus, a movement of stock out of the trust occurred and a third party was present. In contrast, the scenario in this case involves a trustee serving as both the transferor and the transfer agent. No official act of delivery or movement of stock out of the trust took place prior to the sale of stock to Chrysler, which occurred between December 9–20.[12]

Under the second distribution scenario involving the custodial account, the IRS ruled that the date of delivery of the order cancelling the confirmation to the transfer agent was the date of distribution for purposes of I.R.C. § 402(a)(1). Again, the IRS defined the distribution date in terms of the date of delivery to the third party. Although the IRS could have defined the distribution date as the date the cancellation order was drafted by the custodian or the date on which the confirmation was actually cancelled by the transfer agent and reissued in the names of the distributees, it chose not to do so, focusing instead upon the act of delivery.

Rev.Rul. 81–158 instructs that the act of delivery to a third party determines the date of distribution under I.R.C. § 402(a)(1); it does not rule that a distribution occurs every time the custodian of stock changes roles. Although plaintiffs do not emphasize scenario one outlined in Rev.Rul. 81–158, which dealt with a qualified trust distribution, the ruling stipulates that a distribution occurs under section 402(a)(1) only where there is both a movement of assets out of the trust and a delivery to a third party.

In defining the distribution date, the revenue ruling and *Byrne* emphasized not only the act of delivery from the transferor to the transfer agent, but the relinquishment of dominion and control by the transferor. As the *Byrne* court stated:

[W]here ... a transferor of fully endorsed stock certificates delivers such certificates to a broker with the intent that such securities are to become the property of the transferee, we believe that such act is *sufficient to divest the transferor of all dominion and control* over the certificates and to vest in the transferee a beneficial interest in the certificates coextensive with that formerly held by the transferor. Under such circumstances it is our conclusion that, *once delivery has been accomplished, the broker must be regarded as holding the certificates of stock as trustee for the transferee, as opposed to agent for the transferor.*

*Byrne,* 54 T.C. at 1640–41 (emphasis added).

Plaintiffs admit that the trustee never lost its identity as trustee. This fact is difficult to reconcile with the relinquishment of dominion and control language in *Byrne,* as echoed in Rev.Rul. 81–158. In this case the trustee was a hydra-headed entity performing a mixture of duties as trustee and agent with respect to specific assets that remained in the trust. For example, the trustee allegedly initiated the sale of stock to Chrysler as the participants' agent from December 9–20, but regained the status as trustee when it transferred to Chrysler's stock transfer agent the certificates allocable to the individual ESOP accounts of all plan participants on December 26, 1985. Although defendant concedes that the trustee can serve as the agent, the court notes that the activities of the hydra-headed trustee/agent appear inconsistent with the delivery and relinquishment of dominion and control factors expressed in *Byrne* and Rev.Rul. 81–158.

The revenue ruling is also distinguishable because it did not involve the sale of stock. The only movement of stock out of the trust to a third party occurred on December 26,

---

12. Plaintiffs also cite I.R.C. § 402(a)(5)(A), which provides that once a portion of an employee account from a qualified trust is paid to the employee and that employee transfers any part of the distribution to an eligible retirement plan, the distribution from the qualified trust is not includible in gross income. Plaintiffs, however, fail to note that this section contemplates both a movement of assets out of the trust and a distribution to the actual beneficiary.

Plaintiffs next rely on a proposed regulation to advance their position. Specifically, plaintiffs cite Prop.Treas.Reg. § 1.408–8(A–8), 52 Fed.Reg. 28,070 (1987), which states that whenever a direct transfer of property occurs from the trustee of a qualified trust to the trustee of an individual retirement account, the transfer qualifies as a distribution under I.R.C. § 402(a)(1). This proposed regulation does not further plaintiffs' position because it involves a movement of property out of the trust to a third party.

1985. On December 30, 1985, the trustee instructed Chrysler's transfer agent to cancel the certificates representing the shares sold to Chrysler. Plaintiffs argue that the sale concluded on December 30, when the certificates were cancelled. By the time the certificates were transferred out of the trust, the trustee, however, had already received the cash proceeds from the sale that had spanned from December 9–20. Thus, if plaintiffs contend that December 30, 1985, marks the date of distribution, the distribution would be of cash, not stock.

The "Annual Return of Fiduciary of Employee Benefit Trust," Form 5500, Schedule P (the "Fiduciary Return"), dated July 28, 1987, further undermines the position that the trustee relinquished dominion and control over the certificates. Specifically, the return showed that the cash proceeds were assets of the trust as of December 31, 1985. If the stock had been distributed out of the ESOT pre-sale, the proceeds would not have gone back into the ESOT and, accordingly, would not have appeared on the Fiduciary Return as trust assets.

The court declines to extend Rev.Rul. 81–158 so that mere acceptance of an instruction to sell stock without a corresponding movement of stock out of the trust pre-sale constitutes an actual distribution of stock for purposes of I.R.C. § 402(a)(1). Rev.Rul. 81–158 and *Byrne* do not support such an extension. Although the IRS both approved the Chrysler ESOP as one providing for only stock distributions and authorized the trustee to serve as the participants' agent, the IRS did not authorize the rest of the mechanics associated with the distribution transaction in this case.

Cognizant of the court's concerns regarding Rev.Rul. 81–158 as expressed during argument, plaintiffs submitted additional authorities on May 23, 1995. They cited Priv. Ltr.Rul. 95–13–027 (Jan. 4, 1995), in support of their position that actual distributions may occur where only a single fiduciary is involved. However, I.R.C. § 6110(j)(3) stipulates that any written determination, which

includes a ruling, determination letter, or technical advice memorandum, may not be used or cited as precedent.

Although the court cannot rely on the letter ruling, it will address the principal cases cited, which concern the assignment of income principle.[13] The primary case discussed in the ruling was *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958), involving five consolidated cases that addressed the same question of law. In general, the taxpayer owned an interest in an asset, such as sulphur rights, and then assigned a part of that interest to an individual for a specific sum of money.

The legal issue was whether the purchase price for the assigned interest received by the taxpayer constituted ordinary income or long-term capital gain resulting from the sale of property. Applying the assignment of income doctrine, the Court held that the income was ordinary income because the taxpayer was "converting future income into present income." *P.G. Lake*, 356 U.S. at 267, 78 S.Ct. at 695. The Court reasoned that "[t]he lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income...." *Id.*, 356 U.S. at 265, 78 S.Ct. at 694. The Court further ruled that "consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property." *Id.*, 356 U.S. at 266, 78 S.Ct. at 695.

In discussing the assignment of income doctrine, the Court cited *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940), which ruled that when a taxpayer is entitled to receive interest income from an asset and the taxpayer gives the interest portion of the asset to another individual, the taxpayer realizes taxable income when the interest is paid, despite the gift. The Code treats the taxpayer as if he had collected interest payments and then forwarded the money to the donee. Thus, a gratuitous shift in income does not shift the underlying tax burden.

---

**13.** The court notes that the specific point for which plaintiffs cite Priv.Ltr.Rul. 95–13–027 cannot be derived directly from these cases.

The assignment of income doctrine is not applicable to this case. In contrast to *Lake* and *Helvering*, plaintiffs have neither assigned a right to future taxable income, nor received any corresponding present benefit. Plaintiffs only selected the form, cash or stock, in which they preferred to take their interest in the presently-distributable trust assets. Once the election was made, the asset ceased to exist, unlike *Lake* and *Helvering*. These differences preclude the court from applying the assignment of income doctrine to advance plaintiffs' position that a single fiduciary can affect an actual distribution of stock for purposes of I.R.C. § 402(a)(1).

Finally, plaintiffs rely on two revenue rulings. First, plaintiffs cite Rev.Rul. 64–282, 1964–2 C.B. 112, *modifying* Rev.Rul. 64–103, 1964–1 C.B. 160, for the proposition that "the trustee of a qualified trust can act as a participant's agent and that, when the trustee does so, remittances from the trustee are not 'distributions' [for purposes of section 402(a)(1) ]." Plfs' Br. filed Mar. 20, 1995, at 7. Again, plaintiffs provide an overly broad reading of the rule set forth in Rev.Rul. 64–282 and fail to take account of critical factual differences that render the rule inapplicable to the instant case.

Rev.Rul. 64–282 involved the taxability of Series E bonds distributed from a qualified plan to employees. The IRS ruled that the physical delivery of the bonds to the employees did not constitute an amount actually distributed from the plan under section 402(a)(1), since the trustee purchased the bonds solely with employee contributions and since the employee had a right to withdraw the bonds at any time. The IRS reasoned that when the employee has the constant right of withdrawal, "the employee's contributions used to purchase the Series E bonds are not considered to become assets of the trust ...," and therefore I.R.C. § 402(a)(1) is not implicated. The IRS contrasted this situation with one in which the bonds would be distributable only upon the occurrence of a stated event. In such a case, the IRS ruled that the bonds would constitute assets of the trust, taxable upon distribution under section 402(a)(1). The IRS also stated that "the

trustee ... is merely acting as the agent of the employee in purchasing and holding the bonds" where the bonds do not constitute trust assets.

Unlike Rev.Rul. 64–282, this case involves trust assets because, as plaintiffs concede, the distribution of benefits was allowed only upon the occurrence of certain stated events, such as plan termination. Thus, the fact that there was no taxable event under I.R.C. § 402(a)(1) in Rev.Rul. 64–282 when the trustee as agent physically delivered the bonds to the employees has no relevance to this case wherein the shares of stock undeniably constituted trust assets.

Second, plaintiffs rely on Rev.Rul. 68–666 for the proposition that a distribution occurs as a matter of law whenever a fiduciary accepts directions to sell securities from a beneficiary who is entitled to receive a distribution. The ruling involved an estate and specifically held: "[T]he executor's compliance with th[e beneficiaries'] request is the equivalent of a distribution of the securities to the beneficiaries, accompanied by an immediate return of the securities by the beneficiaries with instructions to the executor to sell on their behalf." Plaintiffs acknowledge that this ruling pertains to an estate, but maintain that both trusts and estates are subject to the same tax regime pursuant to I.R.C. § 662.

Plaintiffs err in arguing that all trusts and estates are subject to the same tax regime. Subchapter J, which includes I.R.C. § 662, "deals with the taxation of income of estates and trusts and their beneficiaries, and of income in respect of decedents." Treas.Reg. § 1.641(a)–0(a) (1984 & 1994). "However, the provisions of Subchapter J do not apply to employee trusts subject to Subchapters D and F, Chapter 1 of the Code ...." *Id.* Subchapter D provides the rules concerning deferred compensation and includes I.R.C. §§ 401–409, which set forth the general rules for stock bonus plans. Since the Chrysler ESOP is subject to the provisions of Subchapter D as a stock bonus plan and qualified trust, Subchapter J is inapplicable.

Defendant distinguishes Rev.Rul. 68–666, noting that the ruling has no application to qualified trusts, wherein an actual distribu-

tion is required for purposes of I.R.C. § 402(a)(1). During argument, in response to the court offering this distinction, plaintiffs argued that "Rev[.] Rul[.] 68–666 makes no reference to a constructive distribution. It just says the stock's distributed." Tr. at 20. Plaintiffs further stated that the term constructive distribution existed as of 1968 and that, had the IRS intended to use such a term, it would have done so. Plaintiffs' position is unpersuasive.

The actual distribution requirement of I.R.C. § 402(a)(1) is unique to employee trusts qualified under section 401(a). Plaintiffs have not met their burden of proof to establish that the alleged stock distribution in this case qualifies as an *actual* distribution under section 402(a)(1). *See supra* pp. 14–17. The only authorities proffered concerning section 402(a)(1) contemplate a movement of stock out of the trust, which did not occur in this case. Rev.Rul. 68–666 is also distinguishable, given that estate income is taxable either in the hands of the estate or the beneficiary, whereas the income of a qualified trust is taxable only in the hands of the beneficiary under I.R.C. § 402(a)(1) when an actual distribution occurs. Thus, with respect to estates, the question devolves to who pays the tax. With regard to qualified trusts, in contrast, the question becomes whether the income is taxable at all. Rev. Rul. 68–666 does not advance plaintiffs' theory of a stock distribution.

In addition to distinguishing plaintiffs' authorities as inadequate proof that the stock distribution occurred for purposes of I.R.C. § 402(a)(1) prior to the sale of stock to Chrysler, defendant argues that plaintiffs are bound by the form of the transaction, which, according to defendant, shows a cash distribution. *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974) (holding that taxpayer is bound by form of transaction even though alternate form, if selected, would have resulted in no tax consequences); *Blitzer v. United States*, 231 Ct.Cl. 236, 256, 684 F.2d 874, 887 (1982) (same). Thus, although Chrysler could have contrived a distribution scheme consistent with the terms of the ESOP allowing only

stock distributions, Chrysler and plaintiffs are bound by the form of the transaction.

3. *Whether the form of the transaction show a stock distribution?*

Defendant relies heavily on a memorandum dated November 1985 issued to "Canadian Hourly Participants in the Chrysler Employee Stock Ownership Plan" and the distribution preference card appended to the memorandum. These two documents outlined distribution options available to Canadian employees upon termination of the ESOP. Plaintiffs selected Option 2, which the memorandum described as the option whereby the trustee would sell the shares and distribute cash to the employees. Option 2 further provides that "[t]he cash proceeds from the sa' will earn interest until distributed to you" and that the employees could expect to receive the cash in January 1986 "in U.S. funds, LESS *30% income tax withholding.*" (Emphasis added.)

Section D of the distribution memorandum, entitled "Cash Distribution Tax Considerations—Applicable to Option 2," clarifies that *"[t]he cash distribution* [under Option 2] will be *taxable . . . as ordinary income in 1986."* (Emphasis added.) The distribution preference card reiterated the taxation rule, by stating "100% to me—30% Income Tax Withholding," for Option 2 participants. Option 2 does not discuss a stock distribution, whereas some of the other options specifically provided that the trustee would send the participants certificates representing the shares of stock. See distribution preference card (identifying Option 2 as a "Cash Distribution Option (Sale of shares and distribution of cash)"); distribution memorandum, Option 4 (stating "the Trustee will send you a certificate for your stock. . . ."), and Option 5 (providing that "the Trustee will send you a certificate for all of your stock"). Moreover, the memorandum refers to the taxation of income in 1986, indicating that the distribution did not occur prior to the sale of stock to Chrysler.

According to the terms of these documents, plaintiffs were apprised fully of the tax consequences associated with selecting the distribution defined by Option 2. Plain-

tiffs argue, however, that these administrative documents cannot serve to alter the terms of the ESOP, which, according to the Employee Retirement Income Security Act of 1974 ("ERISA"), control, unless amended pursuant to formal procedures. *See Biggers v. Wittek Indus., Inc.*, 4 F.3d 291, 295 (4th Cir.1993) (citing *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 58–59 (4th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993)).

Plaintiffs are correct in that these administrative utterances, which are facially inconsistent with the ESOP, alone cannot serve to amend the ESOP. This fact alone, however, does not signify that the utterances are without import. In approving the Chrysler ESOP authorizing only stock distributions, the IRS did not concede that any distribution, regardless of form, qualifies as a stock distribution. The administrative documents, cited by defendant, show that plaintiffs were apprised of the potential tax consequences associated with the distribution and that plaintiffs, when presented with the option of receiving cash or stock, elected cash.

The Joint Stipulation of Facts confirms that the IRS informed Chrysler of the tax consequences associated with both stock and cash distributions, prior to the distribution and issuance of the requested IRS rulings, and that, in response to the information, Chrysler had considered issuing individual stock certificates in the names of the approximately 8,000 Canadian employees who had selected Option 2 prior to the sale of the stock to Chrysler. Chrysler was unable to effectuate such a transaction due to timing constraints. Although defendant concedes that the stock need not have been issued in the names of the individual employees, it focuses on the fact that such a transaction contemplated the movement of stock out of the trust, which was not achieved in this case.

According to defendant, the only item distributed out of the trust to plaintiffs was cash on January 17, 1986. The record reveals that the trustee sold plaintiffs' shares to Chrysler from December 9–20 and that Chrysler, seven days following each sale date, sent cash proceeds to the trustee, whereupon those proceeds began accruing interest. The Fiduciary Return shows that the cash proceeds, including interest, constituted assets of the trust as of December 31, 1985. This return demonstrates that the trustee viewed the proceeds from the sale as assets of the trust as of the close of 1985. Defendant further states that had the individual who signed the return deemed the distribution to be of stock, that individual would have committed perjury.[14]

Plaintiffs attempt to temper defendant's characterization of the distribution as one of cash by citing to a series of memoranda from E.R. Hagmaier, Chrysler's Program Manager, Savings & Systems, to James R. Woods, Jr., Stock Transfer Department, Morgan Guaranty, which referred to a distribution date of December 31, 1985. These memoranda severely undermine plaintiffs' position because the sale of plaintiffs' stock occurred between December 9–20. Even assuming, *arguendo,* that the sale concluded on the date on which the trustee instructed Chrysler's transfer agent to cancel the shares, that date was December 30, 1985, one day before the date recited in the memoranda. The only distribution that could have occurred as of December 31, 1985, would have been of cash, not stock.

Plaintiffs also refer to the financial notes attached to the Fiduciary Return, which state: "Upon termination, every participant in the Plan shall receive all stock accumulated in their accounts which represents corporate contributions and earnings to date...." This statement does not specify the form of the distribution, but, instead, simply indicates that each participant will receive the available balance in his account, also known as the "Accrued Benefit," as defined in section 5.2 of the ESOP.

---

14. Plaintiffs distinguish the information on the return, arguing that the trustee was simply following the IRS' rulings issued on May 27, 1986, and June 17, 1987. Plaintiffs' distinction is without merit because Chrysler never requested a ruling as to the form of the specific distribution in this case. The rulings addressed only whether stock and cash distributions would be taxable to nonresident aliens.

Plaintiffs next argue that the individual ESOP account records maintained by the trustee do not show any cash proceeds resulting from the sale of stock. The court finds that the Fiduciary Return showing the cash proceeds as trust assets as of December 31, 1985, is more persuasive authority in terms of defining the status of the trust assets. In addition, the record is unclear whether the individual ESOP accounts recorded uninvested cash, or whether the accounts only showed shares of stock, including Chrysler stock contributions and shares purchased with dividends. *See* Joint Stipulation of Facts, filed Dec. 12, 1994, ¶ 15. Finally, plaintiffs emphasize that interest was paid on the cash proceeds from the date on which the trustee received the funds until the date the funds were remitted to plaintiffs.[15] The interest, as well as the cash proceeds, however, constituted trust assets as of December 31, 1985.[16]

Plaintiffs have not sustained their burden of proof to establish that the distribution in this case was of stock, as opposed to cash. Plaintiffs attempt to explain away a variety of inconsistent administrative utterances, as well as the form of the transaction, which mimics a cash distribution, by focusing on the language of the ESOP. Under plaintiffs' approach the sole fact that the IRS approved the ESOP as one allowing only stock distributions would mean that any distribution, regardless of form, would qualify as a stock distribution. The court declines to endorse this approach.

Although Chrysler could have contrived a distribution mechanism consistent with the terms of the ESOP, Chrysler and plaintiffs are bound by the form of the transaction, which the court finds to be a cash distribution. In addition to the form of the transaction, plaintiffs have failed to provide the court with any authorities to support the

proposition that an actual distribution of stock occurred within the meaning of section 402(a)(1). The authorities cited pertaining to section 402(a)(1) contemplate a movement of stock out of the trust, which did not occur in this case prior to the sale of the stock.

## II. *The source of the earnings and accretions portion of the distribution*

Assuming a cash distribution, the issue becomes whether the earnings and accretions component of the distribution constitutes United States-sourced income taxable under I.R.C. § 871(a)(1), which provides:

> [T]here is hereby imposed for each taxable year a tax of 30 percent of the amount received from *sources within the United States* by a nonresident alien individual as—
>
> (A) interest ..., dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other *fixed or determinable annual or periodical* gains, profits, and *income*, ...

(Emphasis added.)

Plaintiffs advance two alternative positions as to why the earnings and accretions portion of the distribution is not United States-sourced income. First, plaintiffs argue that Treas.Reg. § 1.1441–2(a)(3) (1994), interpreting I.R.C. § 871(a)(1)(A), provides that income from the sale of personal property is "not fixed or determinable annual or periodical income," and is therefore not taxable under section 871(a)(1)(A). Such a gain is taxable only if the nonresident alien is present in the United States for 183 days or more during the year of sale. I.R.C. § 871(a)(2). Second, plaintiffs contend that the earnings and accretions represent compensation for services performed without the United States and that, according to I.R.C. § 862(a)(3), the

---

**15.** The court again notes that the record is unclear as to whether interest began accruing on the date the funds were received by the trustee or on the date of actual sale. *See supra* note 6.

**16.** Plaintiffs also argue that their receipt of a dividend on January 15, 1986, demonstrates that the distribution occurred prior to that date. The record date of the dividend, according to defendant, was December 6, 1995. Even under plain-

tiffs' theory, the ESOT held the stock as of the record date. In addition, the dividend was paid not only to plaintiffs and those participants selecting Option 2, but to all plan participants. I.R.C. § 404(k)(1), (k)(2)(A) authorizes a corporation to distribute dividends directly to the beneficial owners of employer stock held by a qualified plan.

sourcing rule governing compensation, such earnings are not taxable.

1. *Whether the earnings and accretions constitute gain from the sale of property?*

■ Plaintiffs rely on I.R.C. §§ 652(b) and 662(b). These sections are part of Subchapter J, Chapter 1 of the Code, which deals with the taxation of income of estates and trusts and their beneficiaries. Section 652(b) provides that trust income "shall have the same character in the hands of the beneficiary as in the hands of the trust." Section 662(b) stipulates to the same effect. This form of taxation is referred to as the conduit theory of taxation, because the character of trust income in the hands of the trustee passes through to the beneficiaries. *See* Rev.Rul. 81–244, 1981–2 C.B. 151 (applying conduit theory of taxation to Subchapter J trusts and beneficiaries).

Plaintiffs maintain that, because the proceeds from the sale of the stock are capital gains in the hands of the trustee, upon distribution these proceeds are also capital gains in the hands of the beneficiary. Plaintiffs further argue that the gain resulting from the sale of stock in this case qualifies as gain from the sale of personal property and is not subject to taxation under I.R.C. § 871(a)(1)(A). *See* Treas.Reg. § 1.1441–2(a)(3) (stating that income from sale of personal property "is not fixed or determinable annual or periodical income" for purposes of section 871(a)(1)(A)).

Plaintiffs ignore well-established IRS policy to the effect that the pass-through rules relevant to Subchapter J do not apply to employee trusts. Treas.Reg. § 1.641(a)–0(a) states that "[T]he provisions of Subchapter J do not apply to employee trusts subject to Subchapters D and F, Chapter 1 of the Code...." Because the Chrysler ESOP qualifies as an employee trust pursuant to Subchapter D, the pass-through rules of Subchapter J are inapplicable.

The IRS' policy, as articulated through revenue rulings since 1955, is that the conduit theory of taxation embodied in Subchapter J does not apply to distributions from qualified employee plans. Rev.Rul. 72–99,

1972–1 C.B. 115; Rev.Rul. 55–61, 1955–1 C.B. 40; *see* Rev.Rul. 79–388 (confirming that conduit theory of taxation does not apply to employee trusts). Rev.Rul. 55–61 provides that the portion of a qualified trust distribution consisting of interest on tax-exempt securities received by the trust is not excludable from gross income, but, instead, is taxable under I.R.C. § 402(a).

In Rev.Rul. 72–99, the IRS ruled that dividends paid on common stock allocated to an employee's profit-sharing trust account and distributed to the employee were taxable under section 402(a) and did not qualify for the dividend exclusion under I.R.C. § 116. The IRS specifically stated:

> The fact that part of the distribution is derived *from dividends, or any other specific type of income,* has no bearing on the treatment of the distribution for purposes of those sections. *The cash dividends in this case became part of the trust assets when they were paid to the trustee and as such lost their identity as dividends.*

(Emphasis added.) These two rulings confirm that, unlike Subchapter J, the character of income earned by a qualified trust does not pass from the trustee to the beneficiary upon distribution.

The cemetery and alimony trust cases, upon which plaintiffs rely, are inapposite because they involve Subchapter J trusts, not qualified employee trusts under Subchapter D. Once the cash proceeds representing the capital gains from the stock sale became part of the trust, those proceeds lost their identity as capital gains. Accordingly, Treas.Reg. § 1.1441–2(a)(3) addressing the taxation of income from the sale of personal property is inapplicable and the earnings and accretions of the distribution at issue are taxable under I.R.C. § 871(a)(1)(A), unless plaintiffs can point to some other exclusion or rationale for exempting the amount from taxation.

2. *Whether the earnings and accretions represent compensation for services performed outside the United States?*

■ Nonresident aliens are taxed under I.R.C. § 871(a)(1) only with respect to "amount[s] received from *sources within the*

*United States.*" (Emphasis added.) The issue therefore becomes whether the earnings and accretions portion of the distribution at issue constitutes United States-sourced income. Defendant argues that the *situs of the trust* controls the source of the earnings and accretions of a qualified trust distribution. Given that the Chrysler ESOP was sited in the United States, defendant contends that the IRS properly taxed the earnings and accretions to plaintiffs under I.R.C. § 871(a)(1)(A). Plaintiffs reject this sourcing theory and rely instead upon the sourcing rules of I.R.C. §§ 861–865. Specifically, plaintiffs argue that the earnings and accretions represent compensation for services performed outside the United States and therefore that such amounts are not taxable under section 871(a)(1)(A), according to I.R.C. § 862(a)(3).

Defendant contends that the IRS has had a long-standing policy of taxing the earnings and accretions component of distributions from qualified plans as United States-sourced income and that Congress has repeatedly approved such policy by enacting narrow exclusions to the general tax rule. Plaintiffs dispute this characterization, maintaining that the IRS has made several inconsistent rulings as to the taxability of earnings and accretions, so the court should not accord the IRS' tax policy the deference normally provided to a consistently-held agency policy. *See Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981).

In 1952 the IRS published IR–Mim. 71, 1952–2 C.B. 170, which addressed the tax consequences under section 165(a) of the Internal Revenue Code of 1939, the predecessor of I.R.C. § 402, associated with distributions to nonresident beneficiaries from stock bonus, pension, annuity, and profit-sharing plans, when such distributions were based, in whole or in part, on services rendered outside the United States. In IR–Mim. 71, the IRS first outlined the tax policy consistent with that advanced by defendant. Specifically, the IRS stated:

> [A] distribution under or pursuant to a stock bonus ... plan by a domestic trust or insurance company to a nonresident

citizen or nonresident alien is excludable from the gross income of the recipient only to the extent the payment represents (a) a return of the employee's own contributions or (b) amounts actually-contributed by the employer on account of personal services of the alien employee rendered abroad.... *To the extent such payments represent earnings on and accretions to contributions of either the employer or the employee, they constitute income from sources within the United States* and accordingly are includible in gross income unless expressly excludable pursuant to the provisions of an income tax convention....

(Emphasis added.) The IRS notably did not limit the scope of the taxation policy in IR–Mim. 71, but, instead, required that the earnings and accretions of all qualified plan distributions be taxed as United States-sourced income. *See* Rev.Rul. 56–125, 1956–1 C.B. 627 (following general rule of IR–Mim. 71, the portion of a distribution from an employer-funded pension or annuity plan attributable to earnings and accretions on either employer or employee contributions constitutes income from sources within United States).

Eight years following publication of this general tax rule, in 1960, Congress enacted former I.R.C. § 402(a)(4), which has been renumbered and now appears at I.R.C. § 402(e)(2). I.R.C. § 402(a)(4) provided a pro rata exclusion from gross income in the case of retirement benefits paid by the United States from an exempt trust to nonresident aliens. Defendant asserts that section 402(a)(4) would be reduced to mere surplusage if the court adopted plaintiffs' theory of sourcing the earnings and accretions as compensation for services rendered without the United States under section 862(a)(3).

The legislative history indicates that Congress understood and approved the IRS' general policy of taxing the earnings and accretions of a qualified trust distribution, as set forth in IR–Mim. 71. With respect to § 402(a)(4), S.Rep. No. 1028, 86th Cong., 2d Sess. 2 (1960), *reprinted in* 1960 U.S.C.C.A.N. 1902, 1903 (hereinafter "S.Rep. No. 1028"), provides:

Under present law civil service annuities *and certain other retirement benefits* provided by the United States are treated as distributed under 'qualified' pension plans, and when distributions are made to the annuitant he is not taxed on the portion of the payment representing his own contributions to the pension. In addition, he is not taxed on contributions by the employer if these amounts would not be taxable to him had the employer made the payments directly to him.

... In the case of a U.S. civil service retirement pension, the amounts set aside by the Government for the future retirement of a nonresident alien working abroad also are free of tax since if these amounts were paid to him directly they would not be subject to tax. *However, to the extent the annuity represents earnings on the amount set aside by the Government, a tax is due on the payments because this is considered as investment income from sources within the United States.* On this portion of the annuity payments a 30–percent withholding tax generally is applicable.

(Emphasis added.) The "Technical Explanation of the Bill, As Reported," further provides that "if the employee was a nonresident alien during the whole of his employment with the United States and all his services were performed outside the United States, there is generally includible in gross income an amount representing the interest increment on the employee and employer contributions." S.Rep. No. 1028, 1960 U.S.C.C.A.N. at 1904; *see* IR–Mim. 71 (ruling that earnings and accretions from contributions of either employer or employee constitute income from sources within United States and are includible in gross income); *accord* Rev.Rul. 56–125 (same).

By enacting section 402(a)(4), Congress created a narrow exception to the general tax rule enunciated in IR–Mim. 71. Congress deemed such an exception necessary in view of the hardships to nonresident aliens posed by the IRS' tax policy. *See* S.Rep. No. 1028, 1960 U.S.C.C.A.N. at 1903 (indicating that taxing the "earnings on the amount set aside by the Government" for work performed by

nonresident aliens employed by the United States abroad "has engendered resentment against the United States").

Plaintiffs contend that a ruling in their favor would not render I.R.C. § 402(a)(4) superfluous. Plaintiffs argue that the legislative history of section 402(a)(4) discusses only annuities and therefore that only the earnings portion of those distributions is taxable. Since the distribution at issue was not an annuity, in defendant's view, plaintiffs maintain that the situs of the trust source rule does not apply. This distinction lacks merit. In discussing the scope of present tax law, the legislative history speaks of both annuities and "other retirement benefits." *See* S.Rep. No. 1028, 1960 U.S.C.C.A.N. at 1904 (explaining provision as "provid[ing] an additional exclusion ... with respect to *retirement benefits* received from the United States") (emphasis added); *id.* at 1903 (stating that "[u]nder present law civil service annuities *and certain other retirement benefits* provided by the United States are" subject to taxation) (emphasis added).

Plaintiffs' annuity limitation also stands in direct contrast to the official IRS policy, enunciated in IR–Mim. 71, which applied to all qualified plan distributions, not just annuities. By the time Congress enacted I.R.C. § 402(a)(4), IR–Mim. 71 had been in effect for over eight years. Finally, section 402(a)(4) treats distributions generally: "The amount includible ... in the gross income of a nonresident alien individual *with respect to a distribution made by the United States* in respect of services performed." (Emphasis added.) Distributions from the Civil Service Retirement Fund are not limited to annuities. *See* 5 U.S.C. § 8342 (authorizing nonannuity distributions from the Civil Service Retirement Fund).

Plaintiffs also argue that I.R.C. § 402(a)(4) would not be rendered superfluous under their compensation theory, because civil service annuities are funded in equal part by employer and employee contributions. The legislative history, however, does not discriminate between the two types of contributions with respect to taxation of the accrued earnings on such amounts. Rather, S.Rep. No. 1028, 1960 U.S.C.C.A.N. at 1904, provides

that "if the employee was a nonresident alien during the whole of his employment with the United States and all his services were performed outside the United States, there is generally includible in gross income an amount *representing the interest increment on the employee and employer contributions.*" (Emphasis added.) This position is consistent with both IR–Mim. 71 and Rev. Rul. 56–125. *See* IR–Mim. 71 (explaining that "payments represent[ing] earnings on and accretions to contributions of *either the employer or the employee* ... constitute income from sources within the United States....") (emphasis added); Rev.Rul. 56–125 (same).

In 1966 Congress provided additional relief to nonresident aliens by enacting I.R.C. § 871(f), which, in general, provided that any amount received by a nonresident alien as an annuity under a qualified plan distribution is not taxable if the services, for which the annuity is payable, were performed outside the United States. The legislative history supporting section 871(f) explains:

> Under present law a nonresident alien receiving pension or annuity income from a plan located in the United States is subject to U.S. tax ... *on the interest portion of the pension income not withstanding the fact that the services* qualifying the nonresident alien for the pension *were entirely rendered outside the United States.*

S.Rep. No. 1707, 89th Cong., 2d Sess. 27 (1966), 1966 U.S.C.C.A.N. pp. 4446, 4472. (emphasis added).

Defendant argues that if plaintiffs' sourcing approach were adopted and the court were to rule that the earnings and accretions were compensation for services performed outside the United States, I.R.C. § 871(f), like section 402(a)(4), would be reduced to mere surplusage. In briefing plaintiffs stated that "[f]inding a purpose for section 871(f) ... is more difficult. A holding by this court that the entire amount of every qualified trust distribution is compensation for tax purposes would reduce the function of section 871(f) to that of special-interest relief from a dubious IRS practice...." Plfs' Br. filed Mar. 20, 1995, at 23.

During argument, however, plaintiffs did offer a scenario under which I.R.C. § 871(f) would have a purpose if the court were to adopt their position. Specifically, plaintiffs contended that section 871(f) was designed to address those situations wherein an individual retired, but elected to leave the assets in the trust, instead of seeking a distribution. According to plaintiffs, the income earned after retirement is investment income, which is income that would be taxable to the nonresident alien employee had the employee received the income directly, rather than through a trust.[17]

The court is not persuaded by plaintiffs' proposed purpose for I.R.C. § 871(f). Nothing other than pure speculation supports the position that the earnings and accretions of the trust transform from compensation to investment income upon the date of retirement. The IRS policy, enunciated in 1952, and recognized by Congress in 1960, applied to all qualified trust distributions. IR–Mim. 71 included no waivers for income derived prior to retirement.

Similar to the argument advanced with regard to I.R.C. § 402(a)(4), plaintiffs posit that the universe from which Congress carved the section 871(f) annuity exception

---

17. Plaintiffs further maintain that the legislative history speaks of taxing only the interest portion of the annuity or pension, which plaintiffs contend is reasonable, given that they would be taxed on such an amount if they had earned it directly. The court agrees with defendant that the term "interest" is used as a term of art or proxy for all types of income generated by the trust. As established previously, the character of the trust income does not flow through to the beneficiaries upon distribution. Thus, the reference to interest income does not establish definitively the nature of the amount distributed to plaintiffs. The interest income of the trust upon distribution is known as the earnings and accretions of the trust, and this amount is taxable. *See* Rev.Rul. 79–388.

Concluding that the only reasonable inference from the legislative history of I.R.C. § 871(f) is that nonresident aliens are taxable on the part of the qualified trust distribution that would be taxable to them if earned by them directly, plaintiffs assert that the distribution in this case is not taxable because it represents gain from the sale of stock. Plaintiffs' argument must again fail given that the pass-through rules of Subchapter J do not apply to qualified employee trusts. *See supra* pp. 644–45.

should be limited to pensions and annuities, as opposed to all qualified plan distributions, because the legislative history only referred to pensions and annuities. Central to this theory is the position that the distribution in this case did not constitute an annuity. Although the legislative history specifically does not reference IR–Mim. 71, the existence of the policy since 1952 and the narrow exception to that rule provided by section 402(a)(4), leads the court to the conclusion that I.R.C. § 871(f) represents a second effort to reduce the hardships to nonresident aliens posed by IR–Mim. 71, which applies unmistakably to all qualified plan distributions, not only pensions and annuities.

The court concludes that I.R.C. §§ 402(a)(4) and 871(f), enacted in 1960 and 1966, respectively, represent two narrow exceptions to IR–Mim. 71. *See Helvering v. Winmill*, 305 U.S. 79, 83, 59 S.Ct. 45, 46–47, 83 L.Ed. 52 (1938) (holding that Congress' endorsement of existing policy gives that policy the effect of law); *Hunt Foods and Indus., Inc. v. United States*, 193 Ct.Cl. 759, 770, 436 F.2d 443, 448 (1971) (same). Accepting plaintiffs' theory that the earnings and accretions constitute compensation would render these sections superfluous. *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985) (ruling that " 'statute should be interpreted so as not to render one part inoperative....' ") (quoting *Colautti v. Franklin*, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979)). The court cannot presume that Congress enacted a law with no effect.

In 1970 the IRS declared obsolete IR–Mim. 71. *See* Rev.Rul. 70–278, 1970–1 C.B. 281. Plaintiffs cite Gen.Couns.Mem. 36,344 (July 23, 1975), to demonstrate that the IRS questioned the policy of taxing earnings and accretions as expressed in IR–Mim. 71. Much of plaintiffs' brief, in fact, derives from the arguments made in Gen.Couns.Mem. 36,-344, which plaintiffs fail to note was revoked by Gen.Couns.Mem. 38,007 (July 10, 1979). Gen.Couns.Mem. 38,007 provided that Gen.Couns.Mem. 36,344 was revoked to the extent that it concluded that the earnings and accretions from a qualified trust distribution

to nonresident aliens should be sourced according to where the employee performed services. Plaintiffs emphasize that for nine years the IRS had no defined policy concerning the taxation of the earnings and accretions of qualified plan distributions to nonresident aliens.

Defendant asserts that during the nine-year period highlighted by plaintiffs the IRS continued to advise nonresident aliens that the earnings and accretions portion of a qualified plan distribution from a plan sited in the United States was taxable. Department of the Treasury, IRS, *Publication 519 United States Tax Guide for Aliens*, ch. 2 (1978 ed.), specifically stated:

> When a nonresident alien receives a pension from a domestic trust for services rendered within and outside the United States, the amount of the pension that is from U.S. sources is the amount of income earned by the trust and the employer contributions made because of services performed within the United States....

In addition, defendant correctly notes that a General Counsel Memorandum represents internal agency deliberations and cannot be cited by the taxpayer as precedent. *See Casey v. Commissioner*, 50 T.C.M. (CCH) 1,014, 1,020, *aff'd*, 830 F.2d 1092 (10th Cir. 1987).

Citing I.R.C. § 871(f) and Rev.Rul. 56–125 as authority, the IRS in 1979 published Rev. Rul. 79–388, which reiterated the situs of the trust source rule for qualified plan earnings first established in 1952 by IR–Mim. 71. In 1980 Congress amended section 871(f) by broadening the scope of the exclusion to include annuities paid to individuals whose country of residence grants a similar exemption to United States residents. Miscellaneous Revenue Act of 1980, Pub.L. No. 96–605, 94 Stat. 3521, 3528 (1980). In defining "Present Law," the Senate Committee on Finance explained that "a nonresident alien is not subject to U.S. tax on compensation for services performed outside the United States.... He is, however, generally subject to a tax of 30 percent on his investment income (interest, dividends, etc.) from U.S. sources." S.Rep. No. 1036, 96th Cong., 2d Sess. 6–7 (1980), *reprinted in* 1980

U.S.C.C.A.N. 7293, 7298. The Committee further stated that a nonresident alien *"would generally be subject to the 30–percent withholding tax on the portion of the annuity attributable to investment income earned on the contributions while they were invested, unless a statutory or treaty exemption applies." Id.* (emphasis added).

These passages further confirm Congress' understanding that the earnings of qualified trust distributions were sourced according to the situs of the trust. Plaintiffs again focus on the statement of taxing "investment income," which includes "interest, dividends, etc." Plaintiffs' argument is identical to that posed with regard to the 1966 version of I.R.C. § 871(f), and the court rejects the argument for the same reasons. *See supra* note 17. The amendment of section 871(f) confirms that Congress understood the IRS' policy to tax the earnings and accretions of all qualified plan distributions to nonresident aliens. "Congressional reenactment of a statutory provision that is subject to a longstanding administrative interpretation of which Congress was aware at the time of reenactment may well create a presumption that Congress has accepted that interpretation as a permissible one...." *McCoy v. United States*, 802 F.2d 762, 766 (4th Cir. 1986).

Plaintiffs' claim of inconsistent IRS policy provides little support for their sourcing theory. Although the court acknowledges that the IRS vacillated concerning the taxation of the earnings and accretions of qualified trust distributions to nonresident aliens from 1970 through 1979, the narrow statutory exceptions set forth in I.R.C. §§ 402(a)(4) and 871(f) remained unchanged throughout that

period. The chronology defined above reflects a consistent policy of taxing the earnings and accretions of qualified trust distributions to nonresident aliens since 1952. Plaintiffs' reliance on the 1928 legislative history of section 402(a)(1) as conflicting with the legislative histories of sections 402(a)(4) and 871(f) is not convincing.[18]

Plaintiffs' other attempts at showing inconsistency also lack merit. For example, plaintiffs cite Rev.Rul. 73–252, 1973–1 C.B. 337, which held that supplemental unemployment benefits paid to a nonresident alien in Canada from a United States trust operated by a voluntary employees' beneficiary association constituted income from sources without the United States. This revenue ruling is distinguishable on two grounds. First, the ruling is unclear as to whether the benefits paid included an earnings and accretions component or whether they simply represented substitute wage payments. Second, the revenue ruling reasoned that "the main factor in determining the source of income of payments received is whether the location of the property to which the payment related or the situs of the activities that resulted in its being made was in the United States or abroad." (Citations omitted.) In this case the location of the property to which the payment related is the United States, because the earnings and accretions derived from the shares of stock held in the United States trust. The specific activity at issue in this case is the generation of qualified trust income, which also occurred in the United States, given the location of the trust. Plaintiffs' work activities in Canada have no bearing on the generation of the earnings and

**18.** Several commentators agree that the source of the earnings and accretions of a qualified trust are taxable according to the situs of the trust. For example, one commentator states:

There will in general be accretions to the contributions made under a plan of deferred compensation, in the form of investment income to a trust, or in the form of the return provided by an insurance company on an annuity contract. It could be argued that this "interest" component should be treated as compensation, at least for purposes of determining its source, since it is derived from compensation and is not taken into account for tax purposes until received....

Perhaps, unfortunately this is not the law. Rather, the source of the "interest" component is the situs of the trust: if the situs of the trusts is in the United States, then the "interest" component is from United States sources. Congress has confirmed the general validity of this proposition by twice providing narrow statutory exceptions [*i.e.*, I.R.C. §§ 402(a)(4) and 871(f)].

John Harllee, Jr., *U.S. Income Taxation of Aliens on Current and Deferred Compensation*, 37 N.Y.Inst. on Fed.Tax'n, ch. 21, at 30–31 (1979) (footnote omitted citing additional authorities).

**650**

accretions of the trust, because that income derived from the investments of the trust, as opposed to plaintiffs' work.

Plaintiffs argue that *Bank of America v. United States*, 230 Ct.Cl. 679, 686, 680 F.2d 142, 147 (1982), endorses the proposition that "[w]hen an item of income is *not classified within the confines of the statutory scheme* nor by regulation, courts have sourced the income by comparison and analogy with classes of income specified within the statutes." (Citation omitted; emphasis added.) Plaintiffs admit that earnings and accretions of a qualified trust distribution are not sourced in I.R.C. §§ 861 or 862. Sourcing by analogy, plaintiffs assert that the earnings and accretions are compensation for services rendered without the United States and that therefore the distribution is not taxable under I.R.C. § 871(a)(1)(A). *See Karrer v. United States*, 138 Ct.Cl. 385, 396–97, 152 F.Supp. 66, 72 (1957) (sourcing royalties received by nonresident alien from United States' sales of his invention as compensation).

The existence of I.R.C. §§ 402(a)(4) and 871(f) obviates the need for the court to resort to the sourcing by analogy rule of *Bank of America*. Sections 402(a)(4) and 871(f), and their corresponding legislative histories, confirm that the earnings and accretions of a qualified plan are sourced according to the situs of the trust. *See* Rev. Rul. 79–388 (ruling that earnings and accretions of qualified plan distribution are taxable, citing I.R.C. § 871(f) as authority for sourcing rule). Moreover, as noted above, the character of the trust's income does not flow through to plaintiffs. This further undermines plaintiffs' position that the earnings and accretions represent wages for personal services performed abroad.

Notwithstanding this conclusion, the court will discuss certain other authorities upon which plaintiffs rely. During argument plaintiffs emphasized the volume of authorities cited in support of sourcing the earnings

and accretions as compensation. Although plaintiffs cited various authorities, only two cases, *United States v. Basye*, 410 U.S. 441, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973), and *Albertson's, Inc. v. Commissioner*, 42 F.3d 537 (9th Cir.1994), post-date the publication of IR–Mim. 71, which first established that earnings and accretions of qualified plan distributions to nonresident aliens were taxable as income from sources within the United States.[19]

Plaintiffs claim that, if they had not performed the requisite 650 manhours of service per plan year, they would not have received any benefits under the ESOP. Plaintiffs rely on *Basye*, which holds that a payment is compensation if it is "an integral part of the employment arrangement" and that the receipt of such payment does not depend "upon any condition other than continuation of the contractual relationship and the performance of the prescribed ... services." 410 U.S. at 449, 93 S.Ct. at 1085. *Basye* does not advance plaintiffs' case, because it did not rule as to the treatment of the earnings and accretions of a qualified trust. Instead, the Court held that the payments made by a health foundation to a retirement trust were compensation. *Basye* only supports the position that Chrysler's contributions to the ESOP were compensation, an issue to which the parties do not dispute.

Plaintiffs also rely heavily on *Albertson's*, which involved a nonqualified deferred compensation plan. The court at length explained the differences between the taxation of qualified and nonqualified plans. Nonqualified plans implicate the matching rule, which provides that an employer may not take income tax deductions until the employee actually receives the compensation promised. Qualified plans do not implicate the matching rule; therefore, employers may take immediate deductions for any contributions to the plan. The tax scheme is more favorable to qualified plans, because such

---

19. Plaintiffs concede that the IRS "reversed its position in 1952, holding that none of the 'earnings and accretions' of a qualified trust was excludable as ... 'compensation' when earned abroad by a nonresident alien." Plfs' Br. filed Jan. 18, 1995, at 26 (citation omitted). Because

the court finds that the IRS' position concerning the taxation of the earnings and accretions of qualified trust distributions has been consistent since 1952, the court will not address the earlier authorities cited by plaintiffs.

plans involve a number of burdensome requirements and provide employers little flexibility in creating the plan. For example, employers must forward to a third party annually the amounts representing deferred compensation. This requirement disables employers from using those funds until plan distribution. In contrast, money deferred under a nonqualified plan represents only an unsecured promise for payment, so that the employer may use the funds until distribution to the employee. *See* 42 F.3d at 541–42.

The issue in *Albertson's* was whether, under a nonqualified plan, an employer could take current deductions for payments representing interest and take deductions relevant to compensation payments only when the employees actually received such sums. The court rejected this approach, holding that allowing current interest deductions would undermine the express timing restrictions associated with nonqualified plans. Under this approach substantial deductions would be allowed long before the employee received any compensation. In addition, the court ruled that deducting interest "would lead to an anomalous result: a taxation scheme designed to make nonqualified plans less attractive would in many cases provide incentives for adopting such plans." 42 F.3d at 545. Thus, for purposes of evaluating employer deductions, the court held that the interest in the case of a nonqualified plan constitutes compensation and therefore is not deductible until the employee actually receives the compensation.

Seizing on the fact that *Albertson's* defined interest as compensation, plaintiffs conclude that the earnings and accretions constitute compensation. According to plaintiffs, the character of the income as compensation should not change solely because this case involves a qualified trust. Qualified plan arrangements, however, do differ from nonqualified arrangements because of the requirement of a third-party payor. The amount of compensation contributed to a qualified plan is fixed as of the date the money is transferred to the third party or entity responsible for monitoring the funds. The employer may take deductions for the amount contributed to the third party, but

cannot deduct any earnings derived following contribution by the third-party payor.

Plaintiffs seek to extend the favorable tax treatment discussion in *Albertson's* to plan beneficiaries. Although *Albertson's* discussed a tax scheme favoring qualified plans, the discussion was limited to employers, not plan beneficiaries. The court focused solely on preserving the existing tax scheme, designed to encourage employer development of qualified plans: "[F]ew employers would adopt a qualified deferred compensation plan ... if the taxation scheme favored nonqualified plans or treated nonqualified and qualified plans similarly...." 42 F.3d at 542. This result preserved the tax scheme: "Whether or not the additional amounts constitute interest, allowing Albertson's to deduct them prior to their receipt by their employees would contravene the clear purpose of the taxation scheme governing deferred compensation agreements...." *Id.* at 546. Given this motivation for the Ninth Circuit's ruling, the court cannot agree with plaintiffs that *Albertson's* intended that payments under either nonqualified or qualified plans be treated as compensation for all purposes. The decision was intended to rectify an anomaly that resulted from the court's prior decision; as plaintiffs wish to extend it to qualified plans, *Albertson's* would create another anomaly.

Finally, plaintiffs rely on Rev.Rul. 72–3, 1972–1 C.B. 105, *obsoleted by* Rev.Rul. 84–50, 1984–1 C.B. 279, and certain citations to that revenue ruling contained in the legislative history to the Comprehensive Private Pension Security Act of 1973, which, plaintiffs contend, belie that Congress endorsed the sourcing rule for earnings and accretions set forth in IR–Mim. 71 and Rev.Rul. 79–388. *See* S.Rep. No. 383, 93d Cong., 1st Sess. 118 n. 1, 122 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4890, 5001 n. 1, 5005; H.R.Rep. No. 807, 93d Cong., 2d Sess. 110 n. 1, 119 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4670, 4775 n. 1, 4784. In Rev.Rul. 72–3, the IRS ruled that a pension plan did not qualify under I.R.C. § 401(a) where the plan provides for pension benefits to be paid in the amount of "200 percent of the participant's highest average basic salary paid during any

three consecutive years of service." The IRS reasoned that a pension is, in effect, "a 'substitute for earning power;'" consequently, any benefit which exceeds compensation cannot be construed as a substitute. Rev. Rul. 72–3 (quoting *Schlaefer v. Schlaefer*, 112 F.2d 177, 188 (App.D.C.1940)). The legislative history cited by plaintiffs echoes this reasoning, but limits the amount that can be paid under qualified plans to 100 percent of the participant's average compensation.

Rev.Rul. 72–3 and the cited legislative history do not justify plaintiffs' sourcing theory. Plaintiffs' authorities address the limited question of the amount of benefits that may be paid out to beneficiaries in excess of the beneficiaries' average compensation and still qualify as a pension plan under section 401(a). The distribution in this case is not a pension. In addition, no dispute exists as to whether the Chrysler ESOP constitutes a qualified plan under section 401(a). The issue hinges on the tax treatment of the earnings and accretions portion of the .distribution, an issue not addressed by plaintiffs' authorities.

Because plaintiffs have not sufficiently controverted the IRS' policy of taxing the earnings and accretions of qualified plan distributions to nonresident aliens, the court holds that the earnings and accretions component of the distribution is taxable under I.R.C. § 871(a)(1)(A). The presumption is that Congress, in enacting sections 402(a)(4) and 871(f), understood the universe of distributions subject to taxation and did not overlook plaintiffs' distributions in formulating the statutory relief. Thus, the relief that plaintiffs seek in this case lies with Congress, not the court.

III. *The annuity exclusion from gross income under I.R.C. § 871(f)*

 Plaintiffs contend that they qualify for the exclusion from gross income set forth in I.R.C. § 871(f).[20] When construing a statute allowing an income tax exemption, the exemption must be strictly construed, and

any doubts must be resolved in favor of the taxing entity. *Commissioner v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 369, 93 L.Ed. 477 (1949); *Kane v. United States*, 43 F.3d 1446, 1449 (Fed.Cir.1994); *Harding Hosp. Inc. v. United States*, 505 F.2d 1068, 1071 (6th Cir.1974); *see Shimota v. United States*, 21 Cl.Ct. 510, 518 (1990) (holding that tax exemptions are not granted by implication) (citing cases), *aff'd*, 943 F.2d 1312 (Fed.Cir. 1991), *cert. denied*, 503 U.S. 984, 112 S.Ct. 1669, 118 L.Ed.2d 389 (1992).

I.R.C. § 871(f)(1) states that for nonresident aliens:

> gross income does not include any amount *received as an annuity* under a … *qualified trust described in section 401(a)* … if—
>
> (A) all of the personal services by reason of which the annuity is payable were either—
>
> (i) personal services performed outside the United States by an individual who, at the time of performance of such personal services, was a nonresident alien, or
>
> ….
>
> (B) *at the time the first amount is paid as an annuity* … by the trust, 90 percent or more of the employees for whom … benefits are provided … are citizens or residents of the United States.

(Emphasis added.)

I.R.C. § 871(f)(2) states that when the qualified plan does not meet the requirements of section 871(f)(1)(B), the amount shall still be excluded from gross income if "the recipient's country of residence grants a substantially equivalent exclusion to residents and citizens of the United States…." In plaintiffs' view their distribution falls squarely within the parameters of the I.R.C. § 871(f) exclusion, because the distribution constitutes an annuity and Canada grants a substantially equivalent exemption to citizens and residents of the United States.

I.R.C. § 402(a)(1) provides that all qualified plan distributions "*shall be taxable* …

---

**20.** Plaintiffs' argument that the distribution qualifies as an annuity is questionable in light of their position on the previous argument. They had argued that, because the distribution was not an

annuity, the situs of the trust rule discussed in the legislative histories of I.R.C. §§ 402(a)(4) and 871(f) was inapplicable.

*under section 72* (relating to annuities)." (Emphasis added); *see Shimota,* 21 Cl.Ct. at 518 (ruling that distributions under section 402(a)(1) are taxed pursuant to section 72); Treas.Reg. § 1.72–2(a)(3)(i) (1994) (same). The taxation scheme under I.R.C. § 72 differs *depending on whether the amount is* " 'received as an annuity' " or·" 'not received as an annuity.' " Treas.Reg. § 1.72–1(c)(1), (d).

I.R.C. § 72(e) governs "Amounts not received as annuities" and applies to any amounts "received under an annuity ... contract," but which do not qualify as annuities. Because distributions from qualified trusts constitute amounts received under an annuity contract, *Shimota,* 21 Cl.Ct. at 520, the threshold issue is whether the distribution qualifies as an annuity, as that term is defined by the regulations.

Treas.Reg. § 1.72–2(b)(2)(ii) defines "amounts received as an annuity" as amounts "payable in *periodic installments at regular intervals* (whether annually, semiannually, quarterly, monthly, weekly, or otherwise) over a period *of more than one full year* from the annuity starting date...." (Emphasis added.) The payments at issue in this case were received in one single payment and therefore do not qualify as an annuity. *Shimota* supports this conclusion. The court held:

> The lump sum payment at issue is an 'amount not received as an annuity' because it is received in the form of a one-time payment to which § 72 applies pursuant to § 402(a).... Clearly, §§ 72(a) through (c) do not apply because as the Regulations expressly state, those sections only cover amounts which are payable at *regular intervals* over a period of more than one full year.... There is no provision in § 72 other than § 72(e) which logically can apply to plaintiffs' lump-sum distribution.... Thus, § 72(e) is an all inclusive 'catch all' for all payments that are non-annuity payments....

21 Cl.Ct. at 521 (emphasis in original; footnote and citation omitted).

Plaintiffs do not distinguish *Shimota.* Instead, they rely on Treas.Reg. § 1.872–2(e), interpreting I.R.C. § 871(f), which specifies that the section 871(f) exclusion shall not apply to distributions made pursuant to I.R.C. §§ 402(a)(2) and 403(a)(2). *See* I.R.C. § 402(a)(2) (referring to "distributions payable ... to the distributee *within 1 taxable year* ") (emphasis added); I.R.C. § 403(a)(2) (same). Plaintiffs argue that since I.R.C. §§ 402(a)(2) and 403(a)(2) do not comprehend all provisions dealing with distributions payable within one year, Treas.Reg. § 1.872–2(e) was intended to address not only amounts payable over more than one year, but also other distributions not under I.R.C. §§ 402(a)(2) and 403(a)(2) payable within one year.

Although I.R.C. §§ 402(a)(2) and 403(a)(2) discuss payments made within one taxable year, these provisions do not stipulate that the payments will "be payable in periodic installments at regular intervals," which is one of the annuity requirements set forth in Treas.Reg. § 1.72–2(b)(2)(ii). Moreover, the language of section 871(f) indicates that Congress contemplated an annuity consisting of multiple installment payments. Section 871(f)(1)(B) specifically refers to "the time the *first amount is paid as an annuity...*." (Emphasis added.) The annuity requirements under Treas.Reg. § 1.72–2(b)(2), the language of section 871(f), and *Shimota* support the conclusion that a lump-sum distribution is not an annuity for purposes of section 871(f).

No persuasive authority has been presented that would lead the court to conclude that Congress, in enacting section 871(f), contemplated a meaning of the term "annuity" different from the well-established definition. *See Davis Bros., Inc. v. Donovan,* 700 F.2d 1368, 1370 (11th Cir.1983) ("Congress is presumed to use words in their ordinary sense unless it expressly indicates the contrary.") (citations omitted); Webster's II New Riverside University Dictionary 110 (1984) (defining annuity as "[a]n investment on which a person receives fixed payments for a lifetime or a specified number of years"). Thus, the court need not consider the issue of whether Canada grants a substantially similar exclusion to United States citizens or residents, the second requirement under section 871(f).

654

## IV. The effect of the United States–Canada Income Tax Treaty

■ The final issue for resolution is whether the United States–Canada Income Tax Treaty, T.I.A.S. No. 11,087, provides an exemption for the distribution at issue. Plaintiffs first argue that the earnings and accretions constitute remuneration for purposes of art. XV of the Treaty and that therefore the distribution is not taxable. Article XV, ¶ 1, T.I.A.S. No. 11,087, at 17, states:

> Subject to the provisions of Articles XVIII (Pensions and Annuities) and XIX (Government Service), *salaries, wages and other similar remuneration* derived by a resident of a Contracting State in respect of an employment shall be taxable in that State *unless the employment is exercised in the other Contracting State....*

(Emphasis added.)

Plaintiffs emphasize that art. XV is subject to the Treaty provisions pertaining to pensions and annuities under art. XVIII. Plaintiffs infer that, if pensions are remuneration, then the ESOP distribution in this case must be remuneration and hence exempt from tax under art. XV. Alternatively, plaintiffs cite art. III, ¶ 2, which specifies that whenever a term, such as remuneration, is not defined by the Treaty, the meaning of such term must be derived from the country imposing the tax. "Remuneration," as used in I.R.C. § 3401, defines wages as "all remuneration ... for services performed by an employee for his employer." Section 3401 also lists various items of income that, although not wages, constitute remuneration, including distributions from a qualified trust. *See* I.R.C. § 3401(a)(12)(A). Thus, plaintiffs maintain that the art. XV exemption applies.

Article XVIII does not support plaintiffs' position that the distribution constitutes remuneration, because that provision deals only with pensions and annuities. The distribution at issue is neither a pension nor an annuity under United States tax law, but a distribution from a stock bonus plan. *See* Priv.Ltr.Rul. 86–33–081 (citing authorities) [pensions]; *see* discussion *supra* pp. 39–41 [annuities]. With respect to I.R.C. § 3401, although qualified trust distributions are remuneration, art. XV provides an exemption only for "salaries, wages and *other similar remuneration.*" (Emphasis added.) Thus, a distinction exists between wages and other dissimilar forms of remuneration.

The portion of the distribution at issue in this case does not qualify as remuneration similar to wages and salaries. First, art. III, ¶ 2 requires that whenever the Treaty does not define a specific term, the meaning of such term will come from the country imposing the tax. Since 1952 the IRS has rejected treating the earnings and accretions of qualified trust distributions to nonresident aliens as wages, salary, or compensation for services performed abroad. Defining the earnings and accretions as remuneration similar to wages and salary therefore would be inconsistent with established United States tax policy. Second, the earnings and accretions from a qualified trust are "similar" to investment income, not "wages" or "salaries." Investment income is distributed not by the employer but by a third-party payor, the trustee. An employer cannot take deductions for the earnings and accretions of the trust; it can only take deductions for the amounts contributed which represent compensation. Remuneration similar to salaries and wages includes bonuses or commissions, not the earnings and accretions of qualified plan distributions.[21] Thus, art. XV is inapplicable.

Plaintiffs' final argument under the Treaty concerns art. XXII, designed to address those items of income not covered elsewhere in the Treaty. Defendant maintains that art. XXII is the only relevant Article for purposes of this analysis because the Treaty

21. Plaintiffs also argue that art. XIII, ¶ 4 affords an exemption because the distribution qualifies as gain from the alienation of property. Article XIII, ¶ 4, T.I.A.S. No. 11,087, at 16, states: "Gains from the alienation of any property other than ... [real estate and personal business property] shall be taxable only in the Contracting State of which the alienator is a resident." Plaintiffs' argument lacks merit because the ESOT distributed cash, not stock. Moreover, IRS policy, as previously established, does not allow the character of the income of the trust as capital gain to flow through to the beneficiary.

does not otherwise address stock bonus plans, ESOTs, or ESOPs.[22]

Article XXII, ¶ 2, in plaintiffs' view, was included to deal with income distributed by Canadian trusts other than pensions. As in the United States, the character of the income of a Canadian trust does not pass through to the beneficiary. Plaintiffs admit that "Canadian tax law applies to nonresident distributees of Canadian trusts the very rule that the IRS wishes to apply to plaintiffs...." Plfs' Br. filed Jan. 18, 1995, at 39.

Plaintiffs, however, maintain that art. XXII, ¶ 2 does not apply to their distribution because the Chrysler ESOT was not a resident of the United States, given that the ESOT was exempt from taxation under United States tax law. *See* art. IV, ¶ 1, T.I.A.S. No. 11,087, at 6 (defining trust as " 'resident of a Contracting State' " where "income derived by such ... trust *is liable to tax in that State either in its hands or in the hands of its beneficiaries* ") (emphasis added). Relying on the Treasury Department's Technical Explanation of the Treaty, plaintiffs argue that art. XXII, ¶ 2 contemplated taxing only income that qualified as "a separate type of income" under the laws of the Contracting State. Plaintiffs appear to define "a separate type of income" as signifying that the trust must pay taxes on any income derived from trust assets. Plaintiffs also argue "that only distributions from Canadian trusts would be treated as a 'separate type of income.' " Plfs' Br. filed Jan. 18, 1995, at 39 (citation omitted).

Neither the plain language of art. IV nor the Technical Explanation defines a resident trust to include only those trusts whose income is subject to taxation. As defendant correctly notes, art. IV, ¶ 1 states that a trust is a resident of a Contracting State where

income from the trust "is *liable to tax in that state either* in its hands *or in the hands of its beneficiaries.*" (Emphasis added.) The trust qualifies under this definition, because United States tax law stipulates that the earnings and accretions of a qualified plan distribution are taxable in the United States upon distribution to plaintiffs as beneficiaries.

Plaintiffs also rely on the Protocol Amending the Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital, Signed at Washington on September 26, 1980, As Amended by the Protocols signed on June 14, 1983 and March 28, 1984, Mar. 17, 1995, U.S.–Can., T.I.A.S. No. __ (the "Convention"). This Convention modified art. IV, ¶ 1 defining residence, to provide:

> "The term 'resident' of a Contracting State *is understood to include:*
>
> . . . .
>
> (b)(1) A trust, organization or other arrangement that is operated exclusively to administer or provide pension, retirement or employee benefits;
>
> . . . .
>
> that was constituted in that State and that is, by reason of its nature as such, generally exempt from income taxation in that State."

(Emphasis added.)

The Convention, however, did not amend the basic language concerning trusts. It reiterated that a resident of a Contracting State is liable to tax therein "only to the extent that income derived by the estate or trust is liable to tax in that State, either in its

---

22. Article XXII, T.I.A.S. No. 11,087, at 20, provides:
 1. Items of income of a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State, *except that if such income arises in the other Contracting State it may also be taxed in that other State.*
 2. To the extent that income distributed by an estate or trust is subject to the provisions of paragraph 1, then, notwithstanding such provisions, income distributed by an estate or trust

which is a resident of a Contracting State to a resident of the other Contracting State who is a beneficiary of the estate or trust may be taxed in the first-mentioned State and according to the laws of that State, but the tax so charged shall not exceed 15 percent of the gross amount of the income; provided, however, that such income shall be exempt from tax in the first-mentioned State to the extent of any amount distributed out of income arising outside that State.
(Emphasis added.)

hands or in the hands of its beneficiaries...."[23]

The Technical Explanation, cited by plaintiffs, does not provide that "only distributions from Canadian trusts would be treated as a 'separate type of income.'" Plfs' Br. filed Jan. 18, 1995, at 39 (citation omitted). The Technical Explanation, in fact, discusses both Canadian and United States' trusts and specifies:

> [T]o the extent that income distributed by a[ ] ... trust resident in one Contracting State is deemed *under the domestic law of that State to be a separate type of income 'arising' within that State,* such income distributed to a beneficiary resident in the other Contracting State may be taxed in the State of source at a maximum rate of 15 percent of the gross amount of such distribution.

(Emphasis added.) In discussing what constitutes "a separate type of income," the Technical Explanation distinguishes between different types of trusts. Specifically, the Technical Explanation provides that "a distribution by a domestic accumulation trust is not a separate type of income for U.S. purposes," because distributions from such trusts "have the same character in the hands of a nonresident beneficiary as they do in the hands of the trust." Thus, the Technical Explanation concludes that art. XXII, ¶ 2 does not apply where the trust income retains its character in the hands of the beneficiary.

Because the earnings and accretions from a United States qualified trust lose their original character in the hands of the distributee, such distributions qualify as "a separate type of income" sourced within the United States for purposes of art. XXII, ¶ 2. Contrary to plaintiffs' interpretation, the Technical Explanation does not define "a separate type of income" as only that income taxable to the trust. The court holds that art. XXII, ¶ 2 applies equally to Canadian and United States' trusts wherein the character of the

income of the trusts does not pass through to the nonresident beneficiary.

Finally, defendant contends that even assuming, *arguendo,* that the Chrysler ESOP was not a resident trust for purposes of art. XXII, ¶ 2 the distribution remains taxable under ¶ 1 of that same Article. Neither ¶ 1 nor ¶ 2 includes language indicating that whenever a trust is involved, ¶ 2 operates to the exclusion of ¶ 1. Plaintiffs have provided no authority supporting such a position.

The plain language of art. XXII, ¶ 1 states that where income "arises in the other Contracting State," that State may tax the income. In this case the earnings and accretions of the qualified plan distribution had a United States source; therefore, the distribution falls within the general parameters of ¶ 1, which imposes a 30–percent tax. Paragraph 2 provides tax relief for resident trusts by reducing the tax rate to 15 percent. Thus, even assuming that the Chrysler ESOP were not a resident trust, plaintiffs would remain subject to tax, albeit at a higher rate. Article XXII therefore cannot be interpreted to provide a tax exemption to plaintiffs.

A ruling to the contrary would result in a lack of parity with respect to the United States' and Canada's taxing authority for trust distributions. Without express language indicating to the contrary, tax treaties should be construed as granting equivalent taxing power to the signatory countries.

### CONCLUSION

Accordingly, based on the foregoing, plaintiffs' motion for summary judgment is denied, and defendant's cross-motion is granted. The Clerk of the Court shall enter judgment dismissing the complaint.

**IT IS SO ORDERED.**

No costs.

---

23. Plaintiffs also argue that art. XXI, T.I.A.S. No. 11,087, at 19–20, concerning exempt organizations, supports their position that, for a trust to qualify as a resident trust of a Contracting State,

the income of that trust must be taxable in that State. Article XXI is inapplicable because it applies only to the taxation of entities, not distributees, such as plaintiffs.